[No. S133805. Feb. 26, 2007.]

NICOLE TAUS, Plaintiff and Respondent, v.
ELIZABETH LOFTUS et al., Defendants and Appellants.

## COUNSEL

Davis Wright Tremaine, Thomas R. Burke, Rochelle L. Wilcox; Christopher Patti; Selman-Breitman, Jeane Struck, Gregg A. Thornton; Rutan & Tucker and Duke F. Wahlquist for Defendants and Appellants Elizabeth Loftus, Melvin Guyer, Carol Tavris, the Committee for the Scientific Investigation of Claims of the Paranormal (CSICOP), Skeptical Inquirer and Center for Inquiry West.

John P. Hollinrake and Demosthenes Lorandos for Defendant and Appellant Shapiro Investigations.

R. Chris Barden; Bishop, Barry, Howe, Haney & Ryder and Mark C. Raskoff for National Committee of Scientists for Academic Liberty as Amicus Curiae on behalf of Defendants and Appellants.

Thomas A. Pavlinic and Kristine M. Burk for The False Memory Syndrome Foundation as Amicus Curiae on behalf of Defendants and Appellants.

Levine Sullivan Koch & Schulz, James E. Grossberg, Seth D. Berlin, Jeanette Melendez Bead; Harold W. Fuson, Jr.; Michael Kahane, Barbara Tarlow; Cohn &

Marks, Kevin M. Goldberg; Charles J. Glasser, Jr.; Peter Scheer; Thomas W. Newton, James W. Ewert; Anthony M. Bongiorno; David M. Giles; Barbara W. Wall; Jonathan Donnellan, Kristina E. Findikyan; Karlene W. Goller; Stephen J. Burns; King & Ballow, Tonda Rush; Susan E. Weiner, James Lichtman, Craig Bloom; George Freeman, David E. McCraw; Wiley Rein & Fielding, Kathleen A. Kirby; Lucy A. Dalglish, Gregg P. Leslie; Baker & Hostetler, Bruce W. Sanford , Robert D. Lystad, Bruce D. Brown; and Robin Bierstedt for The Copley Press, Inc., American Media, Inc., The American Society of Newspaper Editors, Bloomberg News, California First Amendment Coalition, California Newspaper Publishers Association, CBS Broadcasting, Inc., CBS Radio, Inc., The E.W. Scripps Company, Freedom Communications, Inc., doing business as The Orange County Register, Gannett Co., Inc., The Hearst Corporation, Los Angeles Times Communications LLC, The McClatchy Company, National Newspaper Association, NBC Universal, Inc., The New York Times Company, Radio-Television News Directors Association, The Reporters Committee for Freedom of the Press, Society of Professional Journalists and Time Inc. as Amici Curiae on behalf of Defendants and Appellants.

McCloskey, Hubbard, Ebert & Moore, Hubbard & Ebert and Julian J. Hubbard for Plaintiff and Respondent.

A. Steven Frankel for The Leadership Council on Child Abuse & Interpersonal Violence as Amicus Curiae on behalf of Plaintiff and Respondent.

---

**OPINION**

**GEORGE, C. J.**—Plaintiff in this action, Nicole Taus, was the unnamed subject of a "case study" set forth in a prominent scholarly article describing her apparent recovery of a long-repressed memory of childhood abuse. (The article referred to plaintiff as "Jane Doe.") Defendants are the authors and publishers of two subsequent articles that, in questioning the basic premise advanced by the initial article, disclosed various aspects of plaintiff's family background and personal life but did not disclose her identity. (Like the initial article, defendants' articles referred to plaintiff as "Jane Doe.")

Shortly after the later articles were published, plaintiff filed the present action against defendants, challenging defendants' activities in investigating, publishing, and thereafter publicly discussing their articles and investigation. The complaint asserted that defendants improperly had invaded plaintiff's privacy and committed other tortious conduct by investigating plaintiff's background and discovering and disclosing information concerning her private life without her consent.

Defendants responded by filing special motions to strike the complaint pursuant to California's anti-SLAPP statute (Code Civ. Proc., § 425.16),[1] asserting that the complaint sought to impose liability upon them for actions that were undertaken in furtherance of their constitutional right of free speech. The trial court denied the motions in large part, concluding that the bulk of plaintiff's claims should be permitted to go forward. On appeal, the Court of Appeal held that most of the claims set forth in the complaint should be dismissed under the anti-SLAPP statute, but also concluded that the suit could proceed with regard to four aspects of defendants' conduct that were challenged in the complaint.

Following the Court of Appeal's decision, only defendants sought review in this court. The petition for review contended that although the Court of Appeal was correct in dismissing the bulk of plaintiff's claims, the appellate court had erred in permitting any aspect of the action to go forward. We granted review to consider whether the Court of Appeal correctly determined that plaintiff's suit could proceed as to the four points challenged by defendants.

As explained hereafter, we conclude that the Court of Appeal erred with respect to three of those claims, but that it correctly determined that dismissal is not warranted at this juncture with regard to one of the claims advanced by plaintiff. Accordingly, we shall reverse in part and affirm in part the judgment rendered by the Court of Appeal.

## I

The relevant facts in this case are set forth in some detail in the Court of Appeal's opinion in this matter, and because neither party has taken issue with that court's statement of facts, we shall adopt that portion of the Court of Appeal's opinion, with minor supplementation and stylistic changes.

### A. *Background—Published Articles*

The dispute between these parties arises out of the publication of three articles that appeared in two scientific journals between May 1997 and August 2002.

---

[1] As explained in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d 507, 52 P.3d 685], SLAPP is an acronym for "strategic lawsuit against public participation." Finding that there had been "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" (Code Civ. Proc., § 425.16, subd. (a)), the Legislature in 1992 enacted the motion-to-strike procedure now embodied in section 425.16, subdivisions (b)–(i). All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

1. *The 1997 Child Maltreatment Article*

The May 1997 issue of Child Maltreatment, a scientific journal published by the American Professional Society on the Abuse of Children, contains an essay, authored by David Corwin and Ema Olafson,[2] entitled *Videotaped Discovery of a Reportedly Unrecallable Memory of Child Sexual Abuse: Comparison With a Childhood Interview Videotaped 11 Years Before* (2 Child Maltreatment 91 [hereafter the Child Maltreatment article]).

The Child Maltreatment article contains the following summary of its contents: "This article presents the history, verbatim transcripts, and behavioral observations of a child's disclosure of sexual abuse to Dr. David Corwin in 1984 and the spontaneous return of that reportedly unrecallable memory during an interview between the same individual, now a young adult, and Dr. Corwin 11 years later. Both interviews were videotape recorded. The significance, limitations, and clinical implications of this unique case study are discussed. Five commentaries by researchers from differing empirical perspectives who have reviewed these videotape-recorded interviews follow this article." (Child Maltreatment article, *supra*, at p. 91.)

The young woman who is the subject of the Child Maltreatment article was referred to throughout the article as "Jane Doe" (hereafter sometimes just "Jane"), and all the names of persons and places relating to her story were changed with the exception of the identity of Corwin, who conducted the interviews. According to the article, Corwin became involved in Jane's case in 1984 after Jane's father accused her mother of physically and sexually abusing her. The allegations were made in the context of a custody dispute, and Corwin was appointed by the court to conduct an evaluation.

The Child Maltreatment article contains excerpts from three interviews conducted by Corwin in 1984 when Jane was six years of age. During each interview, Jane told Corwin that her mother had rubbed her finger inside Jane's vagina while giving her a bath. The specific excerpts that are repeated in the article include Jane reporting that her mother first had done this to her when she was three, that these actions hurt, and that her mother had warned she would do "something" to Jane if Jane told her father what her mother had done. During the third interview, Jane consistently maintained that nobody told her to say these things about her mother and that she was not lying. At one point, Corwin inquired whether Jane's mother had said anything when

---

[2] At the time the Child Maltreatment article was published, Corwin (a psychiatrist) and Olafson (a psychologist) were, respectively, the director and co-director of the program on childhood victimization and the law at the University of Cincinnati College of Medicine.

she placed her finger there. Jane reported that her mother asked: "That feel good?," and that Jane had replied no. Jane also said that this had happened on more than 20 occasions and closer to 99 during the time she lived with her mother. (Child Maltreatment article, *supra*, at pp. 94, 100–101.)

The excerpts from the 1984 interviews are interspersed with analysis and with Corwin's conclusions, first drawn and testified to in 1984, that: (1) Jane was physically and sexually abused by her mother, and (2) Jane's mother falsely accused Jane's father of abusing Jane and attempted to coerce Jane into verifying the false accusation. The authors of the Child Maltreatment article reported that their article relied upon background sources in addition to the 1984 interviews, including reports by child protective services and the police, court files and decisions pertaining to the parents' divorce and contentious custody battle, and reports by other evaluators and therapists. According to the article, Jane's statements to Corwin were consistent with statements she previously made to other evaluators. Jane's prior reports of inappropriate behavior by her mother included " 'striking her on several parts of her body, burning her feet on a hot stove, and invading and hurting her genitals and anus with her hands.' " (Child Maltreatment article, *supra*, at p. 95.)

The Child Maltreatment article also contains a transcript of an interview of Jane conducted by Corwin on October 15, 1995, when Jane was 17 years of age. According to the article, the 1995 interview was arranged after Corwin contacted Jane and her father to obtain their consent to continue to use the 1984 videotaped interviews for "professional education," and learned that Jane could not remember the events that were the subject of those earlier interviews and wanted to view the 1984 videotapes. (Child Maltreatment article, *supra*, at p. 98.)

Jane's foster mother accompanied her to the interview with Corwin, who agreed to show the two of them the videotapes of the 1984 interviews. (A local therapist also was present during the interview.) At the outset of the 1995 interview and before viewing the 1984 videotapes, Jane stated that she did remember statements and allegations she had made during those interviews but that "[i]t's the memory of if what I said was true that I'm having a problem with." (Child Maltreatment article, *supra*, at p. 104.) Corwin asked Jane to share what she could recall about that period of time concerning the 1984 interviews and the things she may have said then. Jane described the room where she was interviewed in 1984 and a sweatshirt she may have worn, and began to recount some of the allegations she had made. She recalled accusing her mother of abusing her by burning her feet on a stove

but stated she could not remember whether that was in fact how her feet were burned. Jane told Corwin that she recently had been in contact with her mother, who denied all the allegations of abuse. When Corwin focused the discussion on sexual abuse, the following occurred:

"DC[3] Okay. Do you remember anything about the concerns about possible sexual abuse?

"JD: No. (Eye closure) I mean, I remember that was part of the accusation, but I don't remember anything—(inhales audibly and closes eyes) wait a minute, yeah, I do.

"DC: What do you remember?

"JD: (Pauses) Oh my gosh, that's really, (. . . *Close[s] eyes and holds eyes*) really weird. (Looks at foster mother) I accused her of taking pictures (starts to cry and foster mother puts hand on Jane's shoulder) of me and my brother and selling them and I accused her of—when she was bathing me or whatever, hurting me, and that's—

"DC: As you're saying that to me, you remember having said those things or you remember having experienced those things?

"JD: I remember saying about the pictures, I remember it happening, that she hurt me.

"DC: Hurt you, where? How?

"JD: She hurt me. She—

"Therapist: There's tissues to your right.

"JD: You see. I don't know if it was an intentional hurt—she was bathing me, and I only remember one instance, and she hurt me, she put her fingers too far where she shouldn't have, and she hurt me. But I don't know if it was intentional, or if it was just accidental.

"DC: Can you be more specific because I—?

"JD: I know what was said on the tape. On the tape it was said that she put her fingers in my vagina. And she hurt me.

---

[3] "DC" refers to David Corwin. "JD" refers to Jane Doe. The parenthetical comments were added by the authors of the Child Maltreatment article.

"DC: Okay. Is that what you recall or—

"JD: That's what I recall. I recall saying it, and I recall it happening.

"DC: You recall it happening?

"JD: I recall. I didn't—that's the first time I've remembered that since saying that when I was 6 years old, but I remember." (Child Maltreatment article, *supra*, at pp. 105–106.)

According to the Child Maltreatment article, Corwin thereafter showed Jane the videotapes of the 1984 interviews, took a two and one-half hour break, and then recommenced the 1995 videotaped interview. During that part of the interview, Corwin asked Jane to describe her feelings about viewing the videotapes. Jane responded that the tapes reinforced her belief that her mother had abused her. In her view, the girl she saw on the tapes would not have made up the accusations. Jane also expressed relief that she no longer had to entertain the possibility that her father, who recently had died, had lied to her about her mother.

At the end of the 1995 interview, Jane agreed that Corwin could use her interviews for educational purposes. She stated: "Yeah, I think it's—I mean, I'm prepared to give my life, devote my life, to helping other kids who have gone through what I've gone through, well not necessarily what I've gone through, that have gone through traumatic . . . experiences, by becoming a psychologist or psychiatrist, whichever I decide but, and I by no means want to stand in your way." (Child Maltreatment article, *supra*, at p. 109.)

In the final pages of the Child Maltreatment article, the authors reconciled possible inconsistencies between Jane's recalled memory in 1995 and the accusations she made in 1984, and concluded that "[t]he core recollection, then, is true to her earlier disclosures." (Child Maltreatment article, *supra*, at p. 110.) The authors also suggested that, assuming Jane's memory of abuse actually had been unavailable to her prior to the 1995 interview, Corwin's presence may have helped trigger her recall. Finally, the authors posed questions and issues to explore and address in the future.

In addition to the article by Corwin and Olafson, the May 1997 issue of Child Maltreatment contained five separate shorter articles by prominent professionals in the mental health field who had reviewed the Corwin and Olafson article and the videotaped interviews described in that article.[4] Each

---

[4] The five commentaries are: (1) Ekman, *Expressive Behavior and the Recovery of a Traumatic Memory: Comments on the Videotapes of Jane Doe* (May 1997) 2 Child Maltreatment 113; (2) Putnam, *Commentary* (May 1997) 2 Child Maltreatment 117; (3) Armstrong,

of these case commentaries uniformly praised the manner in which Corwin had conducted his interviews with Jane Doe and generally described the case study as "unique," "extraordinarily important," and providing "important insights" into the nature of missing memories. (E.g., Putnam, *Commentary, supra*, 2 Child Maltreatment 117.) Further, a number of the commentators, in discussing additional questions they believed should be explored, stated that it would be useful to know "what has happened to Jane subsequently. Has she recalled other previously unavailable traumatic memories (e.g., how her feet were burned)? How has this affected her relationship with her mother? . . . It would be interesting to see whether this experience has produced substantial changes in her life, for better or worse." (Putnam, *Commentary, supra*, 2 Child Maltreatment at p. 120; see also Ekman, *Expressive Behavior and the Recovery of a Traumatic Memory: Comments on the Videotapes of Jane Doe, supra*, 2 Child Maltreatment at p. 116 ["Many questions remain unanswered and will only be revealed over time as we can learn how her adult personality takes shape"].)

### 2. *The 2002 Skeptical Inquirer Article*

The May/June 2002 and July/August 2002 issues of the Skeptical Inquirer, a magazine published by the Committee for the Scientific Investigation of Claims of the Paranormal (CSICOP), included a two-part article, written by defendants Elizabeth Loftus and Melvin Guyer,[5] entitled *Who Abused Jane Doe? The Hazards of the Single Case History* (26 Skeptical Inquirer 24, 37 [hereafter, the Skeptical Inquirer article].) The stated premise of the Skeptical Inquirer article is that case studies, although useful to scientists, are "bounded by the perceptions and interpretations of the storyteller" and should be used "to generate hypotheses to be tested, not as answers to questions." (*Id.* at pp. 25, 26.) To illustrate their point, Loftus and Guyer provide "a case study of a case study—a cautionary tale." (*Id.* at p. 26.) The case study they scrutinize is Corwin and Olafson's Child Maltreatment article.

According to the Skeptical Inquirer article, psychological researchers and clinicians disagree as to whether the human mind represses memories of traumatic experiences in such a way that these memories accurately can be recovered years later through tools such as therapy and hypnosis. The article

---

*Exploring the Lines of Jane Doe's Picture of Pain* (May 1997) 2 Child Maltreatment 121; (4) Neisser, *Jane Doe's Memories: Changing the Past to Serve the Present* (May 1997) 2 Child Maltreatment 123; (5) Schooler, *Reflections on a Memory Discovery* (May 1997) 2 Child Maltreatment 126.

[5] At the time the Skeptical Inquirer article was published, Loftus was a psychology professor and adjunct professor of law at the University of Washington and Guyer was a psychology professor at the University of Michigan Medical School.

also states that the Child Maltreatment article has been offered and accepted as proof that traumatic memories eventually can be reliably recovered.

The Skeptical Inquirer article summarizes the content of the Child Maltreatment article and offers the following summary of the reactions of professionals who had read about the Jane Doe case: "Corwin's case study was vivid and compelling. Leading scientists were persuaded by it; indeed, emotionally moved by it. Few considered any other possible explanations of Jane's behavior at six or at seventeen. Few were skeptical that Jane really had been abused by her mother before age six, that her retrieved memories were accurate, or that 'repression' accounted for her forgetting what her mother supposedly had done to her. [¶] *But we were*." (Skeptical Inquirer article, *supra*, at p. 28, italics added by Court of Appeal.)

The Skeptical Inquirer article related that the allegations against Jane's mother in 1984 grew out of a contentious five-year custody battle and were made at a time when many experts were unaware that interviewers looking for evidence of sexual abuse easily could manipulate children and taint their memories. Further, the article states that Corwin had a "vested interest" in persuading others that his initial finding of sexual abuse was accurate and that "some repression-like process" had prevented Jane from recalling that abuse during the period before Corwin re-interviewed her. (Skeptical Inquirer article, *supra*, at p. 29.) Therefore, as Loftus and Guyer explained, "we set out on an odyssey to learn more about the case. Our investigation produced much valuable information that should assist scholars in making their own decisions about whether Jane was abused, and if so, by whom." (*Ibid.*)

The Skeptical Inquirer article describes how Loftus and Guyer found clues to fuel their investigation notwithstanding the fact that Corwin had disguised the case. (Skeptical Inquirer article, *supra*, at p. 29.) For one thing, Corwin showed videotapes of his interviews with Jane Doe at a number of professional meetings and, at some point during the interviews, Corwin used Jane's real first name and a city where she spent some of her childhood. Using this information and other clues from the Child Maltreatment article, the authors of the Skeptical Inquirer article searched legal databases and found a published appellate court case relating to allegations that Jane's father had failed to comply with visitation orders. (See *In re William T.* (1985) 172 Cal.App.3d 790 [218 Cal.Rptr. 420].) That case provided additional factual details about Jane Doe's family. Further, the disclosure of the father's first name and last initial led to a successful search for the father's identity and, according to the authors, "from there we uncovered the full history of the custody dispute and the abuse allegations." (Skeptical Inquirer article, *supra*, at p. 29.)

The Skeptical Inquirer article includes its authors' version of an accurate summary of the facts relevant to Jane Doe's allegations of abuse. This article does not disclose Jane's identity or the real names of persons connected to her case. It does, however, provide details about Jane's history that were not disclosed in the Child Maltreatment article, including unfavorable information about Jane's father and stepmother. Many of the details concerning Jane's history that are disclosed in the Skeptical Inquirer article were obtained through interviews conducted by or on behalf of the authors of the latter article.

Jane's biological mother was interviewed. She continued to deny the allegations of abuse and, according to defendant authors, was "eager for us to visit" and "told us a few things, of course from her perspective, that never appeared in any of Corwin's accounts of this case." (Skeptical Inquirer article, *supra*, at p. 30.) The Skeptical Inquirer article summarizes the mother's story and also reports that the maternal grandmother's best friend and Jane's older brother concur that Jane never was abused by her mother. The article also discloses that, after Corwin reviewed with 17-year-old Jane the allegations of abuse, Jane severed all contact with her mother.

Jane's foster mother, also interviewed for the Skeptical Inquirer article, allegedly described how Jane was "extremely distressed" when she came to live with her. (Skeptical Inquirer article, *supra*, at p. 31.) Jane's father had had a heart attack and could not care for her; Jane's stepmother (who had divorced Jane's father long ago) was out of the picture, and Jane wanted to "put the 'puzzle pieces' of her past together." (*Ibid.*) Jane's foster mother helped Jane contact her biological mother but reported that the renewed relationship was destroyed after Corwin "entered the picture." (*Ibid.*) Jane's foster mother opined that viewing the tapes convinced Jane the abuse had occurred, and that the interview with Corwin dramatically changed Jane: "She went into herself. She became depressed. She started behaving in self-destructive ways, and soon left FosterMom's home." (*Ibid.*) According to this article, Jane's foster mother wondered whether Jane had rejected her because "of the older woman's strict rules against staying out late and misbehavior, or because she was trying to run away from her own misery." (*Id.* at p. 32.) Jane's foster mother also wondered whether viewing the tapes was a mistake.

Jane's stepmother, who also was interviewed for the article, allegedly "volunteered that the way they [that is, Jane's father and stepmother] got Jane away from Mom was 'the sexual angle.'" (Skeptical Inquirer article, *supra*, at p. 32.) During the interview, the stepmother displayed continuing and serious animosity toward Jane's mother, accusing her of such things as being

a "prostitute" and a " 'leech' " who "always had her hand out." (*Ibid.*) According to the article, Jane's stepmother described how she and Jane's father " 'documented' " their case against Jane's mother by, for example, bringing Jane to two hospitals to have her feet examined to support the foot burning allegation. (*Ibid.*) The stepmother also reported that, when Jane was between the ages of four and nine years, Jane spoke to her about the sexual abuse she had endured. The Skeptical Inquirer article includes personal information concerning Jane's stepmother's marital history and legal problems. The authors of the article maintained this information was relevant because Corwin used comparable information regarding Jane's mother to discredit her credibility.

In this article, defendants Loftus and Guyer offer several reasons why they doubt that Jane Doe was physically or sexually abused by her mother, including: (1) six-year-old Jane's reports of abuse were inconsistent; (2) the credibility of Jane's father was not superior to that of Jane's mother in terms of marital stability, criminal history, and other behavior; and (3) at least one expert who conducted a thorough contemporaneous investigation doubted that any abuse had occurred.

The Skeptical Inquirer article also questions whether 17-year-old Jane's memory of an alleged prior event was, in fact, a recovered memory. The authors note, for example, that the evidence indicating that Jane had spoken about the allegations with her stepmother and others during the years between the 1984 interviews and the 1995 interview "undermin[es] claims of massive repression or dissociation." (Skeptical Inquirer article, *supra*, at p. 32.) Further, according to this article, "[t]o the extent that Jane's memory can be regarded as an instance of a recovered, accurate memory, there must be some objective and independent corroboration of the events she purports to remember." (Skeptical Inquirer article, *supra*, at pp. 37, 38.) The authors suggest for several reasons that the required corroboration does not exist: (1) Corwin's original clinical evaluation was neither objective nor reliable; (2) there is no evidence to support the allegation that Jane's mother burned Jane's feet; indeed, the authors' own research supported the conclusion that, if Jane's feet had been burned, the injury would have been documented by the hospitals where Jane was taken or by child protective services, and no such documentation existed; (3) there is no evidence, prior allegation, or even reference in the reports or the evidence to support Jane's supposed recollection that she previously had accused her mother of taking pornographic pictures of her and her brother; and (4) the emotion and personal details captured on the videotapes of the 1984 interviews could persuade not just knowledgeable scientists but Jane herself that the abuse had occurred even if it never had.

The Skeptical Inquirer article contains a postscript in which defendants Loftus and Guyer describe "unexpected" resistance to their efforts to "critically evaluate" Corwin's claim that Jane Doe recovered a repressed memory. (Skeptical Inquirer article, *supra*, at pp. 37, 40.) Defendants contend that critics of their inquiry impeded the publication of their work and that even their respective universities warned them not to publish any of the material they had gathered, "even that which is in the public domain and readily found by anyone with access to a modem and Google search engine." (*Ibid.*) The authors stated: "We are alarmed on behalf of all members of the academic community that our universities, institutions that above all others should be championing the right to free speech and academic debate, so implacably opposed it in this instance." (*Ibid.*)

### 3. *The 2002 Tavris Article*

In addition to the second part of the Loftus and Guyer article, the July/August 2002 issue of the Skeptical Inquirer contained an accompanying article entitled *The High Cost of Skepticism* by Carol Tavris (26 Skeptical Inquirer 41; hereafter the Tavris article).[6] In this article, Tavris posits that the power wielded by university institutional review boards (IRB's) stifles scientific inquiry and progress, and threatens the very foundation of the "skeptical movement." (Tavris article, *supra*, at p. 42.) To illustrate her point, Tavris focuses on the authors of the Skeptical Inquirer article summarized above: "The story of what happened to Elizabeth Loftus and Mel Guyer when they set out to investigate the case of Jane Doe is itself," Tavris contends, "a case study of the high cost of skepticism." (*Ibid.*)

According to the Tavris article, the authors of the Skeptical Inquirer article decided to examine the Jane Doe case and Corwin's "alleged evidence of a recovered memory of sexual abuse," because the "stakes were high for their work as scholars, teachers, and expert witnesses, because the case was already being used in court as evidence that recovered memories of sexual abuse in childhood are reliable." (Tavris article, *supra*, at p. 42.) According to this article, Loftus and Guyer were encouraged to pursue their story after finding that documents in the public record were inconsistent with the Child Maltreatment article.

The Tavris article describes how Loftus and Guyer were treated by the IRB's at the universities where they were employed. The IRB at the University of Michigan, where Guyer was employed, allegedly took the position initially that its approval for this project was unnecessary, because Guyer would not be

---

[6] The article identifies Tavris as a social psychologist, writer, and lecturer, and the co-author of three introductory psychology textbooks.

doing "human subjects research," but then reversed its position a month later, when it "disapproved" the project and recommended that Guyer be repri-manded. (Tavris article, *supra*, at p. 42.) Then, several months later, a new chair of the IRB determined that this project was exempt from IRB consider-ation because it did not involve human subjects research, and found there was no basis for recommending a reprimand.

According to the Tavris article, Loftus and Guyer were encouraged by the "green light given to Guyer at Michigan" and continued their investigation until the University of Washington, where Loftus was employed, received an e-mail from Jane Doe complaining that her privacy was being violated. (Tavris article, *supra*, at p. 42.) Tavris's article offered the following explana-tion as to why the University of Washington should have rejected Jane Doe's complaint out of hand: "Considering that David Corwin had published his account of her life and was traveling around the country showing videotapes of Jane at six and seventeen, and considering that no one was making her story public (and hence violating her 'privacy') except Jane herself and Corwin, this complaint should have been recognized as a cry from a troubled and vulnerable young woman, and set aside." (*Id.* at pp. 42–43.)

Instead, Tavris reports, the "investigation" conducted by the University of Washington lasted more than 21 months, consisted of a series of shifting charges against Loftus, often kept secret from her, and was fueled by improper outside influences. These influences included a scathing memoran-dum drafted by a member of the University of Michigan's IRB who was critical of Guyer, as well as the litigation strategies of opposing counsel in an out-of-state court case in which Loftus was a defense expert and Corwin was a plaintiff's expert. Ultimately, Tavris reports, Loftus was exonerated of charges of "scholarly misconduct," and the University of Washington con-cluded that her investigation of the Jane Doe case did not constitute human subjects research. Even then, however, Loftus's employer, the University of Washington, instructed her not to contact Jane Doe's mother again, or to interview anyone else in the case without advance approval.

The Tavris article describes Jane Doe as "an unhappy young woman whose life has been filled with conflict and loss." (Tavris article, *supra*, at p. 43.) It characterizes Corwin as a man "who has publicly promoted his case study as a personal vindication and a prototype of how recovered memories should be studied" (*ibid.*) while presenting Loftus and Guyer as heroes whose "courage, persistence, and integrity" made them "willing to 'offend' in the pursuit of truth and justice." (*Ibid.*) [End of adopted excerpt Court of Appeal opinion.]

B. *First Amended Complaint*

On February 13, 2003, a few months after the publication of the Skeptical Inquirer and Tavris articles, plaintiff filed the initial complaint in this proceeding against Loftus, Guyer, Tavris, the Skeptical Inquirer, the University of Washington, and Shapiro Investigations, a private investigation company that had performed some investigation services for Loftus. In the initial paragraph of the complaint, plaintiff identified herself as "Lieutenant Junior Grade Nicole S. Taus, also known as 'Jane Doe' in publications referred to herein." As far as the record reveals, the filing of the complaint was the first occasion on which "Jane Doe's" true identity was publicly disclosed. The complaint also disclosed other personal information about plaintiff, including the names of her parents, the year she was born, and the city where she was raised.

On March 6, 2003, prior to any response by defendants, plaintiff filed a first amended complaint, adding CSICOP (the publisher of Skeptical Inquirer) and the Center for Inquiry West (an affiliate of CSICOP) as defendants. The first amended complaint, which is the operative complaint for purposes of the present proceeding, sets forth four causes of action.

The first cause of action alleged that all defendants were liable to plaintiff for negligent infliction of emotional distress. The complaint asserted that defendants had "misused their knowledge and skills as psychologists, researchers[,] and writers and exploited plaintiff when they knew or should have known that plaintiff had a background and personal history of abuse so as to make her extremely susceptible to emotional abuse, slander, libel and exploitation."

The second cause of action, also directed at all defendants, sought recovery for invasion of privacy. The complaint maintained that plaintiff is not a public figure and has a constitutional and statutory right to privacy, particularly with respect to her medical history and juvenile court records. The complaint asserted that defendants obtained private information about plaintiff both legally and by false representations and published that information, including statements about plaintiff that are not truthful. In particular, the complaint alleged that defendants employed fraudulent means to obtain private information from plaintiff's relatives, including misrepresenting their identity and befriending plaintiff's biological mother.

The third cause of action, directed at Loftus and the University of Washington, sought recovery for fraud. The fraud claim against Loftus was based on allegations that Loftus made misrepresentations to plaintiff's relatives and friends in order to obtain private information about her, and the

claim against the University of Washington apparently rested on allegations that the university falsely had represented to plaintiff that the process under which she filed an ethics complaint against Loftus with the university would be confidential.

Finally, the fourth cause of action, directed against Loftus and Tavris, sought recovery for defamation. The complaint alleged that Loftus and Tavris made oral and written statements about plaintiff "designed to suggest that she was unhappy, vulnerable, and of questionable fitness for her duty as an officer in the military." The claim against Tavris related solely to statements in the Tavris article. The claim against Loftus was based both on statements in the Skeptical Inquirer article and on "public and disparaging statements about plaintiff" allegedly made by Loftus after the publication of the Skeptical Inquirer, including Loftus's alleged remark at a professional conference that "Jane Doe engaged in destructive behavior that I cannot reveal on advice of my attorney. Jane is in the Navy representing our country."

### C. *The Motion to Strike*

On May 13, 2003, defendants Loftus, Guyer, Tavris, the Skeptical Inquirer, CSICOP, and the Center for Inquiry West filed a motion pursuant to the anti-SLAPP provisions of section 425.16 to strike the first amended complaint; Shapiro Investigations subsequently joined in the motion. The motion to strike was accompanied by a variety of exhibits and declarations. Plaintiff filed an opposition to the motion to strike, maintaining that section 425.16 is inapplicable because statements about her are not matters of legitimate public concern and that, in any event, the declarations and other materials accompanying the opposition demonstrate a probability that she would prevail on the merits of each of her claims. Defendants filed a reply to the opposition, attaching additional declarations and exhibits.

After consideration of the motion, opposition, and reply, and the accompanying declarations and exhibits, the trial court denied the motion to strike the causes of action for negligent infliction of emotional distress and invasion of privacy. The trial court granted the motion to strike the cause of action for fraud against Loftus but denied the motion as to that cause of action against the University of Washington,[7] and granted the motion to strike the cause of action for defamation against Tavris, but denied the motion as to that claim against Loftus.

---

[7] Because the University of Washington did not file a motion to strike under section 425.16, the causes of action against the university were not formally before the trial court with regard to that motion. The University of Washington has not appealed from the trial court's ruling, and accordingly the viability of plaintiff's action against the university is not before us in the present proceeding.

All defendants that had filed the motion to strike appealed from those portions of the trial court's ruling permitting the majority of plaintiff's claims to proceed. Plaintiff did not appeal from the portions of the trial court's ruling striking the fraud cause of action against Loftus and the defamation cause of action against Tavris, and accordingly those portions of the trial court's ruling were not before the Court of Appeal and are not before us.

### D. The Court of Appeal's Decision

In analyzing the validity of the trial court's ruling on the motion to strike, the Court of Appeal turned initially to the terms of the anti-SLAPP statute, section 425.16, and in particular to subdivision (b)(1) of that provision, which provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." As the Court of Appeal recognized, past cases establish that in ruling on a section 425.16 motion to strike, a court generally should engage in a two-step process: "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th 53, 67 (*Equilon*).)

In undertaking the first step of the analysis—namely, determining whether the conduct or activity of defendants that gave rise to plaintiff's claims was activity in furtherance of defendants' right of petition or free speech in connection with a public issue—the Court of Appeal noted that section 425.16, subdivision (e) defines such activity as including "*any written or oral statement or writing* made in a place open to the public or a public forum *in connection with an issue of public interest*" as well as "*any other conduct* in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech *in connection with a public issue or an issue of public interest*." (§ 425.16, subd. (e)(3) & (4), italics added.) The Court of Appeal then pointed out that "the statements and conduct which gave rise to [plaintiff's] causes of action relate specifically to the validity of the Jane Doe case study which was the subject of the Child Maltreatment article and, more generally, to the question whether childhood memories of traumatic sexual abuse can be repressed and later recovered (the repressed memory theory)." The appellate court further observed that the record before the trial court "contains considerable evidence of both (1) an ongoing controversy in academic and clinical circles within the field of psychology as

to the validity of the repressed memory theory, and (2) that the publications at the root of this litigation are part of this ongoing debate." In light of these circumstances, the Court of Appeal concluded that the activities of defendants that gave rise to plaintiff's action—that is, investigating, publishing, and speaking about the subjects of their magazine articles—were acts in furtherance of defendants' right of free speech for purposes of the anti-SLAPP statute.[8]

The Court of Appeal then turned to the second step of the section 425.16 analysis—namely, whether plaintiff had demonstrated a probability of prevailing on each of the claims that the trial court had declined to dismiss. Because the remaining claims that are now before this court can best be understood in light of the Court of Appeal's discussion and disposition of all of plaintiff's claims, we shall summarize that court's analysis of the potential merit of each of the claims that the trial court declined to dismiss.

### 1. *Negligent Infliction of Emotional Distress*

With respect to the first cause of action—for negligent infliction of emotional distress—the Court of Appeal concluded that the complaint failed

---

[8] The Court of Appeal concluded that the conduct of defendants that gave rise to plaintiff's action related to a public issue or an issue of public interest within the meaning of section 425.16, subdivision (e)—a conclusion that we believe is clearly correct. (See *post,* at pp. 712–713.) In the course of its discussion of this point, however, the Court of Appeal also noted that plaintiff "maintains that she is a private figure, [and] that she has never taken any position with respect to the clinical implications of the Jane Doe case study or played any role in an alleged controversy relating to the theory that traumatic experiences can be repressed and subsequently recalled." The appellate court then stated: "We agree with these assertions." In explaining its agreement with plaintiff's description of herself as a "private figure," the Court of Appeal expressed the view that "[plaintiff], whose identity was not publicly revealed until she filed this lawsuit, cannot reasonably be characterized as a person who was in the public eye when [defendants] allegedly engaged in the conduct which gave rise to [plaintiff's] claims."

Defendants vigorously challenge the Court of Appeal's position on this point, maintaining that plaintiff, by repeatedly consenting to have the videotapes and transcripts of her conversations with Corwin publicly disclosed and used extensively in educational seminars and set forth in Corwin and Olafson's Child Maltreatment article, cannot properly be viewed as a "private figure" but rather must be properly considered a "limited public figure" for constitutional free speech purposes even though Corwin did not reveal plaintiff's real name. As discussed below, we do not believe it is necessary to decide in this case whether plaintiff's voluntary actions with respect to the publication and use of her interviews with Corwin rendered her a limited public figure for constitutional purposes. (See *post,* at pp. 720–721, fn. 16.) At the same time, however, we believe it is prudent to express reservations regarding the Court of Appeal's unequivocal endorsement of plaintiff's claim to be a "private person" who "cannot reasonably be characterized as a person who was in the public eye . . . ." In our view, there is at the very least a strong argument that free speech considerations would support treating plaintiff as a limited public figure in light of (1) her voluntary consent to Corwin's public use of videotapes revealing her face and voice, and (2) the prominent role that her case study attained in the ongoing controversy regarding the repressed memory theory.

to "articulate any theory of negligence that might apply in this case." The appellate court noted that although plaintiff's appellate brief contained "an extremely vague argument that [defendants] breached their ethical obligations by violating applicable professional standards," plaintiff had failed to "identify a single ethical obligation or professional standard that was allegedly breached. Instead, she contends that [defendants] have essentially conceded that publishing the Skeptical Inquirer article constituted a violation of the ethical obligations of a psychologist. Not surprisingly, [defendants] concede no such thing." Accordingly, the Court of Appeal concluded that plaintiff had failed to demonstrate a probability that she would prevail on her negligent-infliction-of-emotional-distress theory, and held that this claim must be stricken.

## 2. Invasion of Privacy

With regard to the second cause of action—for invasion of privacy—the Court of Appeal determined that the allegations in the first amended complaint potentially implicated two distinct invasion-of-privacy torts—(1) the tort of improper public disclosure of private facts, and (2) the tort of improper intrusion into private matters (see generally *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 214–242 [74 Cal.Rptr.2d 843, 955 P.2d 469] (*Shulman*))—and it separately discussed the viability of these two distinct tort theories.

### a. Public-disclosure-of-private-facts Tort

As to the public-disclosure-of-private-facts tort, the Court of Appeal indicated that the complaint identified three allegedly improper disclosures: (1) the Skeptical Inquirer article, (2) the Tavris article, and (3) statements that Loftus made in other contexts. Noting that past cases had established that "lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability" for this tort (*Shulman, supra*, 18 Cal.4th 200, 215), the Court of Appeal initially determined that neither the complaint nor the material submitted in conjunction with the motion to strike "identified any private fact that was revealed in the Skeptical Inquirer or Tavris articles which is not newsworthy." The court found in this regard that "[t]o the extent these articles disclosed private information about [plaintiff's] past that was not already disclosed in the Child Maltreatment article, these facts related to the validity of Corwin's conclusions that [plaintiff] was abused by her mother, repressed the memory of sexual abuse and then recovered that memory 11 years later," and that "the role of the Jane Doe case study in the repressed memory debate made the

validity of that case study a matter of legitimate public interest."[9] Accordingly, the Court of Appeal held that plaintiff had not demonstrated a probability of prevailing on the private-facts tort with regard to any of the disclosures made in either the Skeptical Inquirer or Tavris articles.

At the same time, however, the Court of Appeal concluded that plaintiff had demonstrated a probability of prevailing on a private-facts tort theory with regard to statements that Loftus had made in other contexts. The Court of Appeal noted in this regard that "there is evidence in the record that Loftus made the following statement at an October 2002 professional conference: 'Jane Doe engaged in destructive behavior that I cannot reveal on advice of my attorney. Jane is in the Navy representing our country,' " and that "[t]here is also evidence that Loftus revealed the first and last initial of [plaintiff's] real name during a deposition in an unrelated court action." The Court of Appeal concluded that "[t]hese comments publicly disclose private information about Taus which is not newsworthy. They do not relate in any way to the validity of the Jane Doe study, the repressed memory debate or to any other matter of legitimate public interest. They are clues to the true identity of Jane Doe and, under the circumstances, a reasonable jury could find that disclosing this information was both offensive and objectionable."

Accordingly, although the Court of Appeal concluded that the private-facts tort could not proceed with regard to any disclosures in the Skeptical Inquirer or Tavris articles themselves, the appellate court held that plaintiff had demonstrated a probability of prevailing on a private-facts tort theory against Loftus on the basis of statements relating to plaintiff that Loftus allegedly made at a professional conference and during a deposition in an unrelated court action.

### b. *Intrusion-into-private-matters Tort*

With regard to the intrusion-into-private-matters tort, under which liability may be imposed for an intrusion into a "private place, conversation, or matter . . . in a manner highly offensive to a reasonable person" (*Shulman, supra*, 18 Cal.4th 200, 231), the Court of Appeal found that plaintiff "has identified three alleged intrusions into her zone of privacy: (1) establishing a friendship with [plaintiff's] biological mother in order to obtain personal information about [plaintiff]; (2) securing interviews with friends and family through fraudulent means; and (3) collecting and disseminating confidential

---

[9] The Court of Appeal acknowledged that the Tavris article also disclosed that Jane Doe had filed an ethics complaint against Loftus with the University of Washington, but the court held that "facts relating to the University investigation were not private to [plaintiff] because they also directly relate to Loftus's personal and professional lives" and because they also pertain "though not as directly, to the repressed memory debate which is a matter of public interest."

information about [plaintiff] from various court files." The Court of Appeal separately analyzed each of these alleged intrusions.

With regard to the initial alleged intrusion, the appellate court held that "[t]he friendship between Loftus and [plaintiff's] mother is not an intrusion into [plaintiff's] private life." The court explained that "[t]he subjects that [plaintiff's] mother discussed with Loftus were not private to [plaintiff] because they also obviously involved [plaintiff's] mother," and that "[plaintiff's] mother has as much right to share her story with Loftus as [plaintiff] has to share the details of her life with Corwin." Accordingly, the Court of Appeal concluded that Loftus's conduct in befriending plaintiff's mother did not support a cause of action for improper intrusion.

With regard to plaintiffs' claim that defendants could be held liable for improper intrusion into private matters by conducting interviews with plaintiff's relatives or friends by fraudulent means, however, the Court of Appeal concluded that the evidence presented by defendant was sufficient to support the imposition of liability on this theory. The appellate court relied on a declaration of plaintiff's foster mother, Margie Cantrell, that alleged: "Loftus contacted [Cantrell] in late 1997, told her she [Loftus] was working with Corwin to help [plaintiff], and requested that Cantrell come to an office to answer some questions. Cantrell stated that she accepted the invitation because she knew Corwin and she knew that [plaintiff] trusted him and because she wanted to help [plaintiff]. Cantrell further stated that when she met Loftus, Loftus welcomed her, 'saying again that she was working with Dr. Corwin and was actually his supervisor in connection with his study of [plaintiff].' " The Court of Appeal stated that "Cantrell's declaration is undisputed evidence that [defendants] penetrated a zone of privacy which included Cantrell, who was not only a close friend and confidant of [plaintiff's] but also a mother figure to her, by misrepresenting their identity and true purpose. Appellants contend that only Cantrell has standing to pursue a claim based on these alleged misrepresentations. We agree that [plaintiff] cannot use this evidence to support her fraud claim. On the other hand, this evidence is relevant to show that [defendants] intruded into a private area of [plaintiff's] life. Indeed, this evidence actually suggests that [defendants] were aware that the information they sought was private and that it would not have been shared with them had they been truthful about the nature and purpose of their investigation." Accordingly, the Court of Appeal concluded that plaintiff had demonstrated a probability of prevailing on an intrusion-into-private-matters tort on the basis of Lotus's alleged misrepresentations to Cantrell.

With respect to plaintiff's claim that defendants had engaged in an improper intrusion into private matters by obtaining private information from

court records, the Court of Appeal explained that plaintiff actually had advanced two distinct arguments in this regard. First, plaintiff argued that defendants had engaged in improper intrusion in gathering information about her "from documents, such as medical and [child protective services] reports, which, although contained in files open to the public, were of a confidential nature." The Court of Appeal found that this portion of plaintiff's claim lacked merit, relying on our holding in *Shulman, supra,* 18 Cal.4th 200, 231, that there can be " 'no liability for the examination of a public record concerning the plaintiff.' "

Second, the Court of Appeal noted that plaintiff also argued that defendants had obtained private information about her from documents contained within her juvenile dependency file. Because such files are not open to the public, but rather are confidential, the Court of Appeal concluded that defendants could be held liable for improper intrusion if they improperly had obtained access to plaintiff's confidential juvenile court records. Although defendants vigorously maintained that "any medical or psychological reports they obtained came from the Stanislaus County divorce proceeding"—a public record—and pointed out that plaintiff had failed to adduce any evidence that defendants had accessed plaintiff's confidential juvenile court records in Solano County, the Court of Appeal, relying upon a statement in a declaration from the owner of Shapiro Investigations that one of his employees had copied "voluminous public records" at the Solano County courthouse that may have been relevant to the Jane Doe case, concluded that the record contained sufficient evidence from which "a jury could reasonably infer that some form of trickery or misconduct was employed" to obtain confidential files in Solano County. Accordingly, the Court of Appeal concluded that plaintiff's improper-intrusion-into-private-matters claim could go forward insofar as it was based on defendants' conduct in gaining improper access to, and using information derived from, plaintiff's confidential juvenile court files.

### 3. *Defamation*

Finally, the Court of Appeal examined whether plaintiff had established a probability of prevailing on her defamation claim against defendant Loftus. In addressing this issue, the appellate court noted that the defamation claim was based on five distinct statements—three that appeared in the Skeptical Inquirer article, and two that Loftus allegedly had made in other contexts. The Court of Appeal found that none of the first four challenged statements properly could support a defamation claim, but concluded that the defamation action could proceed with regard to the final statement challenged by plaintiff.

In analyzing the defamation claim, the Court of Appeal turned first to the three statements in the Skeptical Inquirer article that plaintiff asserted provided a proper basis for a defamation action. The statements in question, as set forth by the Court of Appeal, are as follows: "(1) After Jane met with Corwin and viewed the tapes, 'she started behaving in self-destructive ways, and soon left FosterMom's home.' [¶] (2) 'Jane terminated her newly emerging relationship with her mother after Corwin came back into her life and replayed her childhood tape. Her mother lost her once, long ago in 1984, and lost her again in 1995. At this writing they are not in contact with one another.' [¶] (3) 'If the abuse never happened in the first place, the adult-child may be mistakenly led to believe that it did because she does not understand that there are reasons why a child might make an abuse report even when no abuse had occurred. She may be led to act on the basis of this "new information" in ways that she would not have otherwise acted, with results devastating for her and others. In this case, for example, Jane terminated her newly re-forming relationship with her mother after seeing her childhood tapes.' "

The Court of Appeal concluded that plaintiff had failed to demonstrate either that any express factual assertion in any of these three statements is false or that the statements reasonably could be construed as implying one or more falsehoods about her. With respect to the first statement, the court rejected plaintiff's assertion that the statement reasonably could be construed as stating that plaintiff had physically injured herself and had run away from home, observing instead that "the statement relates to Jane's foster mother's recollection about Jane's change in behavior after she viewed the tapes, which included such things as expressing anger toward the foster mother and refusing to follow 'strict rules against staying out late and misbehavior' "— conduct that, as the appellate court noted, plaintiff "has not denied engaging in." With respect to the second and third statements from the Skeptical Inquirer article, the Court of Appeal concluded that the false implication to which plaintiff suggested the statements gave rise—that viewing the videotapes had caused plaintiff to terminate her relationship with her biological mother when, plaintiff asserts, it was "Loftus's own interference" that caused the subsequent rift between her and her biological mother—was actually a subjective "expression[] of opinion . . . that could be drawn from facts presented in both the Child Maltreatment and the Skeptical Inquirer articles," and, as such, could not support a defamation action against Loftus.

The Court of Appeal then turned to the first statement not contained in the Skeptical Inquirer article that plaintiff claimed was defamatory. On June 14, 2001, prior to the publication of that article and while the University of Washington's investigation of plaintiff's ethics complaint against Loftus's

investigatory activities was ongoing, Loftus made the following statement during a speech to the annual meeting of the American Psychological Society in Toronto:[10] "I continue to be the target of efforts to censor my ideas. I am gagged at the moment and may not give you the details. . . . Who after all benefits from my silence? Who benefits from such investigations in the dark? The only people who operate in the dark are thieves, assassins and cowards." The Court of Appeal found that "[u]nder the circumstances, no reasonable person who heard this statement on June 14, 2001, could have interpreted it as a statement of actual fact concerning [plaintiff]. Because this statement was made before the Skeptical Inquirer article was published, it is unlikely anyone even connected it to Jane Doe." Moreover, the Court of Appeal found that even after the publication of the Skeptical Inquirer article, "any reasonable person would understand Loftus's colorful statement as the rhetoric of an agitated advocate whose efforts to promote a professional theory were thwarted by those who disagreed with her. As used in this way, the terms 'thieves, assassins and cowards' are nothing more than ' "subjective expressions of disapproval, devoid of factual content." ' " Accordingly, the Court of Appeal concluded that the June 14, 2001 statement would not support a defamation claim.

With respect to the last statement of Loftus on which plaintiff's defamation claim was based, however, the Court of Appeal concluded that the defamation claim should be permitted to go forward. The statement in question was the same statement allegedly made by Loftus at the October 2002 professional conference that the Court of Appeal previously had found could support an action for improper public disclosure of private facts. As noted above, Loftus allegedly stated at the conference that "Jane Doe engaged in destructive behavior that I cannot reveal on advice of my attorney. Jane is in the Navy representing our country." In the Court of Appeal's view, these remarks were not "an expression of opinion or a subjective professional judgment drawn from fully disclosed facts" but rather "could reasonably be interpreted as implying that [plaintiff's] ongoing destructive behavior or the effects of past behavior make her unfit for military service"—a defamatory implication. Moreover, the Court of Appeal concluded that "in contrast to the statements made in the Skeptical Inquirer article, this statement does not relate to a matter of public interest. It has no bearing on the validity of the Jane Doe case study or on any aspect of the controversy relating to the repressed memory theory." In light of its determination that "the public has no legitimate interest in that matter," the Court of Appeal concluded that "the truth of the alleged statement is a defense with respect to which Loftus has

---

[10] Loftus's remarks were delivered during her acceptance speech upon receiving the American Psychological Society's 2001 William James Fellow Award for scientific achievement.

the burden of proof," and because Loftus had not presented any evidence that plaintiff had engaged in behavior that made her unfit for military service, the appellate court held that the record demonstrated a probability that plaintiff would prevail on her claim for defamation based on Loftus's October 2002 statement.

### 4. Court of Appeal's Conclusion

In sum, although the Court of Appeal concluded that the majority of plaintiff's claims against defendants should have been dismissed, it held that the action could go forward with respect to (1) a cause of action for improper public disclosure of private facts based upon Loftus's alleged statement at the October 2002 professional conference and Loftus's disclosure of plaintiff's initials during a deposition in an unrelated case, (2) a cause of action for improper intrusion into private matters based upon Loftus's alleged misrepresentations to plaintiff's foster mother and upon defendants' alleged intrusion into confidential juvenile court files, and (3) a cause of action for defamation based upon Loftus's alleged statement at the October 2002 professional conference.

### E. Petition for Review and Issues Before This Court

After the Court of Appeal issued its opinion, only defendants petitioned for review in this court, raising contentions relating solely to those claims as to which the Court of Appeal had found that defendants' anti-SLAPP motion properly was denied. Because plaintiff did not petition for review or file an answer contesting any issue on which the Court of Appeal ruled against her, we have no occasion to address any such issue here.[11]

Accordingly, the only issues before us are whether the Court of Appeal properly concluded that dismissal under the anti-SLAPP statute was improper with regard to plaintiff's claims relating to the following four incidents or conduct allegedly engaged in by one or more of the defendants:

1. Loftus's statement at the October 2002 professional seminar (relating to Jane Doe's position in the military), which the Court of Appeal concluded could support either (a) a cause of action for public disclosure of private facts, or (b) a cause of action for defamation.

---

[11] An amicus curiae brief filed in this court on behalf of plaintiff asserts at some length that actions undertaken by Loftus and Guyer in the course of their investigation for the Skeptical Inquirer article violated federal standards relating to human subjects research. As noted above, the Court of Appeal rejected plaintiff's claim that the first amended complaint stated a cause of action based on defendants' alleged breach of professional ethics, and plaintiff did not seek review of that ruling. Accordingly, the human-subjects-research issue raised by amicus curiae is not properly before us and will not be addressed.

2. Loftus's disclosure of plaintiff's initials during a deposition in March 2003, a disclosure that the Court of Appeal concluded would support, along with Loftus's statements at the October 2002 seminar, a cause of action for public disclosure of private facts.

3. Defendants' collection of information from court records, which the Court of Appeal concluded would support a cause of action for improper intrusion into private matters.

4. Loftus's alleged misrepresentation of her relationship with Corwin in obtaining information about plaintiff from plaintiff's foster mother, which the Court of Appeal concluded would support a cause of action for improper intrusion into private matters.

We begin by discussing the standard that governs the determination of a motion to strike under the anti-SLAPP statute, and then turn to the application of that standard to each of the four incidents in question.

## II

As explained above, this appeal is from a trial court ruling on a special motion to strike under California's anti-SLAPP statute. Section 425.16, subdivision (b)(1) provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." As the Court of Appeal recognized, in applying the statute a court generally is required to engage in a two-step process: "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon, supra,* 29 Cal.4th 53, 67.)

Here, we believe there can be no question but that defendants' general course of conduct from which plaintiff's cause of action arose was clearly activity "in furtherance of [defendants'] exercise of . . . free speech . . . in connection with a public issue" within the meaning of section 425.16. As the initial Child Maltreatment article itself makes abundantly clear, at the time of defendants' actions there was a substantial controversy in the mental health field regarding whether, and under what circumstances, a victim of child abuse might forget or suppress the memory of the abuse over a long period of time and later recover that memory in response to questioning or other

actions by a therapist. (See Child Maltreatment article, *supra*, at pp. 91–92.)[12] Further, defendants unquestionably were engaged in conduct in furtherance of their right of free speech in (1) conducting an investigation with regard to the validity of the Child Maltreatment article, (2) writing and publishing responsive articles questioning the conclusions of the Child Maltreatment article, and (3) speaking at professional conferences and meetings regarding the issues raised by the articles. Because the various causes of action set forth in plaintiff's first amended complaint sought to impose liability upon defendants on the basis of such conduct, the claims plainly fell within the scope of the anti-SLAPP statute.[13]

■ Accordingly, in order to avoid dismissal of each claim under section 425.16, plaintiff bore the burden of demonstrating a probability that she would prevail on the particular claim. In *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733], we explained what such a showing entails: "In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of

---

[12] At the very outset of the Child Maltreatment article, the authors noted that "[i]n addition to the dozens of articles and scholarly papers about this subject, the titles of several recent books reflect the polarized nature of this memory debate. In 1994, *The Myth of Repressed Memory: False Memories and Allegations of Abuse*, by Loftus and Ketchum, and *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria*, by Ofshe and Watters, were published. Whitfield's *Memory and Abuse: Remembering and Healing the Effects of Trauma* appeared in 1995. In 1996 *The Recovered Memory/False Memory Debate*, by Pezdek and Banks, and *Recovered Memories of Abuse, Assessment, Therapy, Forensics*, by Pope and Brown, were published. . . . The debate has divided clinicians and experimental psychologists, with clinicians arguing that recovered memories of past traumas are often factual, and experimentalists arguing that they may be false memories derived from therapeutic suggestion . . . ." (Child Maltreatment article, *supra*, at p. 91.)

The authors of the Child Maltreatment article then stated: "The clearest conclusion from this debate is that much remains to be learned about human memory, how both traumatic and nontraumatic memories are preserved, how they can become unavailable to the person who experienced them, how they are sometimes discovered, and how they can become contaminated mixtures of both accurate and inaccurate information. Many questions remain unanswered concerning the false memory phenomenon as well. Who are the most susceptible to developing these false beliefs, and under what conditions are false memories most likely to occur? Once established, what is the stability of these false beliefs over time? Perhaps the most important question, and probably the most elusive to definitively answer, is whether differences can be observed between apparent recollections that have little grounding in reality and those that are more factual." (Child Maltreatment article, *supra*, at pp. 91–92.)

[13] Although Loftus's disclosure of plaintiff's initials occurred at a deposition in a case that was unrelated to the investigation or publication of the articles at issue, as described below (*post*, at pp. 723–724) the disclosure was in direct response to a question relating to Lotus's investigation of plaintiff and the resulting controversy, and thus the potential imposition of liability on the basis of this statement also fell within the scope of the anti-SLAPP statute.

facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]" (28 Cal.4th at p. 821, original italics.) (See also, e.g., *Equilon, supra,* 29 Cal.4th 53, 63 [section 425.16 "subjects to potential dismissal . . . those causes of action as to which the plaintiff is unable to show a probability of prevailing on the merits [citation], a provision we have read as 'requiring the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim' "]; *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958] [under section 425.16 "the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation"].)

As the foregoing decisions demonstrate, although by its terms section 425.16, subdivision (b)(1) calls upon a court to determine whether "the plaintiff has established that there is a *probability* that the plaintiff will prevail on the claim" (italics added), past cases interpreting this provision establish that the Legislature did not intend that a court, in ruling on a motion to strike under this statute, would weigh conflicting evidence to determine whether it is more probable than not that plaintiff will prevail on the claim, but rather intended to establish a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect on speech-related activities. (See also *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1122–1123 [81 Cal.Rptr.2d 471, 969 P.2d 564]; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 412 [58 Cal.Rptr.2d 875, 926 P.2d 1061].) Accordingly, when a defendant makes the threshold showing that a cause of action that has been filed against him or her arises out of the defendant's speech-related conduct, the provision affords the defendant the opportunity, at the earliest stages of litigation, to have the claim stricken if the plaintiff is unable to demonstrate both that the claim is legally sufficient and that there is sufficient evidence to establish a prima facie case with respect to the claim.

As discussed above, the Court of Appeal held that plaintiff failed to establish such a probability of prevailing with regard to the bulk of defendants' conduct to which the complaint was directed, and plaintiff did not seek review of the appellate court's decision. Accordingly, the claims found deficient by the Court of Appeal are not before us. The issues before us are limited to those claims as to which the Court of Appeal found that plaintiff adequately had established a prima facie case to avoid dismissal under section 425.16. As noted, the claims in question relate to defendants' conduct in four

separate instances: (1) a statement allegedly made by Loftus at a professional conference in October 2002 disclosing Jane Doe's position in the military, (2) Loftus's disclosure of plaintiff's initials at a deposition in March 2003, (3) defendants' alleged improper collection of information from confidential court files in researching the Skeptical Inquirer article, and (4) Loftus's alleged misrepresentation of her relationship with Corwin in order to obtain information relating to plaintiff from plaintiff's foster mother during the investigation and research for the Skeptical Inquirer article.

We discuss each of these claims in turn. As we shall explain, with respect to the first three matters—Loftus's statement at the October 2002 conference disclosing Jane Doe's position in the military, Loftus's disclosure of plaintiff's initials at a March 2003 deposition, and defendants' alleged improper collection of information from court files—we conclude that the Court of Appeal erred in finding that plaintiff had satisfied her burden of establishing a prima facie case on any cause of action based on these incidents. With respect to the fourth matter—Loftus's alleged misrepresentation of her relationship with Corwin for the purpose of obtaining information from plaintiff's foster mother—we agree with the Court of Appeal's determination that a prima facie case has been established.

### III

Plaintiff's claims regarding the October 2002 conference are based entirely on the facts set forth in a declaration of a single witness, Lynn Crook. Crook's declaration states that she has a master's degree in educational psychology and is an "investigative journalist by profession," and discloses that she "first encountered" Loftus in the mid-1990's when Loftus testified as an adverse expert witness in a civil sexual abuse case in which Crook herself was the plaintiff. The declaration reveals that Crook and Loftus subsequently have had a long-standing history of hostile relations, with Crook filing a series of ethics complaints against Loftus with the American Psychological Association and the University of Washington, and Loftus responding with what Crook's declaration characterizes as "years of systematic harassment."

The bulk of Crook's declaration is directed at Loftus's activities and methodology in investigating and writing the Skeptical Inquirer article and thus is concerned with claims that were rejected by the Court of Appeal and that are not before this court, but three paragraphs of the declaration relate to Loftus's statements at the October 2002 conference. The declaration states in this regard that in October 2002, Crook attended the False Memory Syndrome Foundation conference held in Illinois, and was present at a talk given by Loftus at the conference. The declaration states that Loftus's remarks were not audiotaped or videotaped, but that Crook "made careful

notes." The declaration indicates that although Loftus expressed sympathy for plaintiff's biological mother, Loftus's "composure and tone changed when talking about 'Jane' herself. In a sarcastic tone, she told the audience: 'Jane Doe engaged in destructive behavior that I cannot reveal on advice of my attorney. Jane is in the Navy representing our country.'" In Crook's view, "the clear implication was that 'Jane' had engaged in such destructive activity as to render her service in the Navy as questionable, perhaps even dangerous to the country."

Loftus submitted a declaration and a supplemental declaration in support of the motion to strike, taking issue with Crook's version of the statements made by Loftus at the October 2002 conference. Loftus's declaration indicates that she was invited to speak at the October 2002 conference of the False Memory Syndrome Foundation in Chicago, Illinois, and on that occasion she lectured on the Jane Doe article, "mostly reading directly from the Skeptical Inquirer article."

With regard to the specific statements attributed to her by Crook's declaration, Loftus does not deny stating at different points during the October 2002 conference that Jane Doe engaged in "destructive behavior" or that she was "in the military," but she denies that the two statements were in any way linked. Loftus's declaration states: "As I recall, in response to a question from the audience about what I understood Jane Doe was 'doing now,' I simply responded that she was 'in the military.' I never said or implied that Jane Doe was not 'fit' to serve in the military. I did not intend to make that implication." The declaration further states that with regard to "the use of the term 'destructive,' I did use that term in the article in describing how Jane Doe had purportedly reacted to her purported recovered memories of her alleged abuse. I wrote: 'According to Foster Mom, Jane changed dramatically after the interview with Corwin. . . . She started behaving in self-destructive ways.' [Citation.] I may have mentioned this point in the lecture too, but I did not specify what the 'self-destructive' behavior was, even though I did possess more specific information. I did not elaborate at the time out of my concern for Jane Doe's privacy."

Although Loftus did not go into the details of Jane Doe's self-destructive behavior in either the Skeptical Inquirer article or at the October 2002 conference, Loftus's declaration states: "Now that Plaintiff has brought this action, in my defense, it is appropriate that I explain that my comments were based on information that I had learned during my investigation. Jane Doe's foster mother told me during my interview of her that shortly after apparently recovering her memories in 1995, Plaintiff started sleeping with boys and doing drugs. Plaintiff also snuck out of the house at night. And she apparently left the care of her foster mother. At the time I made this observation about

Jane Doe's 'destructive' behavior, I believed the underlying facts to be true. To this day, I continue to believe that the information I learned from my research was truthful."

In response to this portion of the Loftus declaration, the declaration submitted by plaintiff states: "Dr. Loftus has deliberately dumped into the record in her declaration here that Margie Cantrell told her that after 'recovering her memories in 1995' . . . 'Plaintiff started sleeping with boys and doing drugs.' . . . I am absolutely astonished as to the depths to which defendant Loftus will stoop. These are statements attributed to someone who was defrauded into saying anything to Dr. Loftus. The statements may have reflected concerns Ms. Cantrell had at the time, but they are false statements." Cantrell also submitted a declaration stating that she agreed to speak with Loftus only after Loftus had misrepresented her relationship with Corwin. In her declaration, however, Cantrell did not deny making the statements about plaintiff attributed to her by Loftus's declaration.

As discussed above, the Court of Appeal held that the allegations of the complaint and the declarations filed with the trial court relating to Loftus's alleged statement at the October 2002 conference were sufficient to establish a prima facie case with respect to two causes of action: (1) improper public disclosure of private facts, and (2) defamation. We turn first to the public-disclosure-of-private-facts cause of action.

### A. *Public-disclosure-of-private-facts Action*

In this court's decision in *Shulman, supra*, 18 Cal.4th 200, 214, we set forth the elements of the public-disclosure-of-private-facts tort as follows: " '(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern.' " In discussing the fourth element, we explained in *Shulman* that "lack of newsworthiness is an element of the 'private facts' tort, making newsworthiness a complete bar to common law liability." (*Id.* at p. 215.)[14]

Considering the relevant facts revealed by the record in light of the elements of the public-disclosure-of-private-facts tort, we disagree with the Court of Appeal's conclusion that plaintiff established a prima facie case with regard to this tort. To begin with, we have very serious doubts whether either of the statements in question—that Jane Doe engaged in "destructive behavior that I cannot reveal on advice of my attorney," or that Jane Doe is in the Navy—constitutes disclosure of the kind of sufficiently sensitive or intimate

---

[14] *Shulman* also observed that newsworthiness is "a constitutional defense to, or privilege against, liability for publication of truthful information." (*Shulman, supra*, 18 Cal.4th 200, 216.)

private fact "which would be offensive and objectionable to the reasonable person" so as to support a cause of action under the public-disclosure-of-private-facts tort. (See, e.g., *Coverstone v. Davies* (1976) 38 Cal.2d 315, 323 [239 P.2d 876] [public-disclosure-of-private-facts tort applies to "the unwarranted publication by defendant of *intimate details* of plaintiff's private life" (italics added)].)[15] We need not decide that question here, however, because unlike the Court of Appeal we conclude that the facts disclosed—relating generally to how the experiences described in the case study may have affected Jane Doe's subsequent conduct and career as an adult—clearly are newsworthy, and for that reason cannot properly be the basis of such a tort action.

■ Our decision in *Shulman* discussed the "newsworthiness" standard at some length, and it is useful to review that discussion here. We explained that "courts have generally protected the privacy of otherwise private individuals involved in events of public interest 'by requiring that a logical nexus exist between the complaining individual and the matter of . . . public interest.' [Citation.] The contents of the publication or broadcast are protected only if they have 'some substantial relevance to a matter of legitimate public interest.' [Citation.] Thus, recent decisions have generally tested newsworthiness with regard to such individuals by assessing the logical relationship or nexus, or the lack thereof, between the events or activities that brought the person into the public eye and the particular facts disclosed. . . . This approach accords with our own prior decisions, in that it balances the public's right to know against the plaintiff's privacy interest by drawing a protective line at the point the material revealed ceases to have any substantial connection to the subject matter of the newsworthy report. [Citation.] This approach also echoes the Restatement commentators' widely quoted and cited

---

[15] In addition to the question whether the comments in question pertain to sufficiently sensitive or intimate matters to support a public-disclosure-of-private-facts tort, there is an additional question whether the alleged statement can support either a public-disclosure-of-private-facts action or a defamation action inasmuch as Loftus never disclosed plaintiff's identity at the October 2002 conference, but simply referred to her as Jane Doe. In contending that the statement nonetheless can support both causes of action, plaintiff relies upon cases that hold that a statement may support a cause of action for defamation even if it does not specifically identify the plaintiff by name, so long as a recipient of the communication reasonably understands that the statement was intended to refer to the plaintiff. (See, e.g., *Washer v. Bank of America* (1943) 21 Cal.2d 822, 829 [136 P.2d 297].) Here, the statement in question clearly was intended to refer to a particular person—the subject of the case study described in the Child Maltreatment article—but the subject was not identified by name and her identity was not widely known. Because we conclude, for the reasons discussed hereafter, that both the public-disclosure-of-private-facts action and the defamation action are deficient for other reasons, we need not determine whether the circumstance that the October 2002 statement did not identify plaintiff by name represents an additional fatal defect with respect to either cause of action.

view that legitimate public interest does not include 'a morbid and sensational prying into private lives *for its own sake* . . . .' " (*Shulman, supra*, 18 Cal.4th 200, 223–224, citations omitted.)

*Shulman* also makes it clear that "[a]n analysis measuring newsworthiness of facts about an otherwise private person involuntarily involved in an event of public interest by their relevance to a newsworthy subject matter incorporates considerable deference to reporters and editors . . . . In general, it is not for a court or jury to say how a particular story is best covered." (*Shulman, supra*, 18 Cal.4th 200, 224–225, fn. omitted.) "By confining our interference to extreme cases, the courts 'avoid[] unduly limiting . . . the exercise of effective editorial judgment.' " (*Id.* at p. 225.)

Defendants claim that plaintiff in this case, unlike the plaintiff in *Shulman*, should not be viewed as "an otherwise private person involuntarily involved in an event of public interest," because plaintiff voluntarily consented to have the videotapes of her sessions with Corwin used for educational purposes and set forth in a published article. Plaintiff challenges this view, contending that she gave only limited consent and that the consent should not be treated as having broadly opened her life to intensive scrutiny.

We need not resolve that question because, even if we assume, as plaintiff contends, that plaintiff should be considered "an otherwise private person involuntarily involved in an event of public interest" within the meaning of the *Shulman* decision (*Shulman, supra*, 18 Cal.4th 200, 224), we conclude that under the standard set forth in *Shulman* it is nonetheless clear that the statements here at issue were newsworthy. As discussed above, a number of the commentators whose articles about the Jane Doe case study were published with the Child Maltreatment article itself remarked that it would be important and of interest from an academic standpoint to learn the effects of the events described in the case study upon Jane's future development. In light of the prominence of the Jane Doe case study in the repressed memory field, we find that the disclosure of such facts was newsworthy. This is particularly true because the particular revelations at issue—that Jane Doe engaged in unspecified "destructive behavior" and "is now in the Navy"— were not of an "[i]ntensely personal or intimate" nature. (Cf. *Shulman, supra*, 18 Cal.4th at p. 226 ["the balance of free press and privacy interests may require a different conclusion when the intrusiveness of the revelation is greatly disproportionate to its relevance. Intensely personal or intimate revelations might not, in a given case, be considered newsworthy, especially where they bear only slight relevance to a topic of legitimate public concern"].) Under these circumstances, we conclude that the record does not support a determination that plaintiff has established a prima facie case of improper disclosure of private facts based upon Loftus's alleged statement at the October 2002 professional conference.

## B. *Defamation Action*

As noted, in addition to determining that Loftus's alleged statement at the October 2002 conference could support a tort action for improper disclosure of private facts, the Court of Appeal held that this statement also could support a cause of action for defamation against Loftus. For the reasons discussed hereafter, we disagree.

■ The tort of defamation "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782, citing Civ. Code, §§ 45–46 and cases.)

In concluding that the statement at issue could support a cause of action for defamation, the Court of Appeal held that "this statement is not an expression of opinion or a subjective professional judgment drawn from fully disclosed facts. The truth of the factual assertion that [plaintiff] is in the military is undisputed. However, when viewed in its totality, this challenged statement could reasonably be interpreted as implying that Taus's ongoing destructive behavior or the effects of past behavior make her unfit for military service."

As an initial matter, even if—contrary to Loftus's declaration—the two sentences in question were linked together in a single statement and even if we assume that the statement was reasonably susceptible of the defamatory meaning that Loftus intended to imply that plaintiff was unfit for military service, it appears very doubtful that such a statement properly could be viewed as *a statement of fact* (which could support a defamation action), rather than *an expression of opinion* (which cannot). (See, e.g., *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 604 [131 Cal.Rptr. 641, 552 P.2d 425].)

In any event, we conclude that plaintiff failed to establish a prima facie case on the defamation claim in light of a factor not raised by the parties or considered by the Court of Appeal—the qualified privilege to which the statements in question are entitled under the so-called common-interest privilege established by Civil Code section 47, subdivision (c)(1). (See generally 5 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 591–594, pp. 867–874.)[16]

---

[16] The potential applicability of Civil Code section 47, subdivision (c) was not discussed by any of the parties in the trial court or Court of Appeal, but because our research indicated the potential relevance of this statutory provision, we invited the parties to file supplemental briefs addressed to the issue and the parties have done so.

In view of our conclusion that the *statutory* qualified privilege established by Civil Code section 47, subdivision (c) applies in the present context, we need not reach the question

Civil Code section 47, subdivision (c)(1) provides in relevant part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested . . . ." In light of past California cases applying section 47, subdivision (c)(1), it is clear that the alleged defamatory statement here in question—a statement made by Loftus, a psychology professor and author, at a professional conference attended by other mental health professionals and that was related to the subject of the conference—falls within the reach of this statutory common-interest privilege. (See, e.g., *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1204 [31 Cal.Rptr.2d 776, 875 P.2d 1279] ["The parties do not dispute that the allegedly defamatory statements at issue in the present case, made by defendants at a seminar to persons sharing a common interest in horse breeding, were made upon a 'privileged occasion' for purposes of the common-interest privilege"]; *Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 7–14 [170 Cal.Rptr. 411] [common-interest privilege applies to letter, criticizing plaintiff's "sports-specific" psychological testing, that was sent by university physical education professor to athletic organizations and sports magazines]; *Katz v. Rosen* (1975) 48 Cal.App.3d 1032 [121 Cal.Rptr. 853] [common-interest privilege applies to letter sent by defendant to local bar association complaining of plaintiff attorney's conduct]. See generally 2 Smolla, Law of Defamation (2d ed. 1997) § 8.56, pp. 8-36 to 8-38; Eldredge, The Law of Defamation (1978) § 87, pp. 481, 484–485.)

■ Under Civil Code section 47, subdivision (c), defendant generally bears the initial burden of establishing that the statement in question was made on a privileged occasion, and thereafter the burden shifts to plaintiff to establish that the statement was made with malice. (*Lundquist v. Reusser, supra*, 7 Cal.4th 1193, 1202.) Because the evidence presented on the motion to strike clearly demonstrates that the statements at the October 2002 conference were made on a privileged occasion, plaintiff bore the burden of establishing a prima facie case that these statements were made with " '[a]ctual malice.' " (Civ. Code, § 48a, subd. 4(d).) As we explained in *Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413 [134 Cal.Rptr. 402, 556 P.2d 764]: " 'The malice necessary to defeat a qualified privilege is "actual malice" which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights (citations).' "

whether, as defendants vigorously contend, plaintiff—by virtue of her repeated consent to have her background and videotaped interviews publicly disclosed and utilized by Dr. Corwin in professional conferences and other educational settings—should be considered a limited public figure so as to bring into play a *constitutionally based* qualified privilege under the First Amendment of the federal Constitution.

In our view, the evidence presented in the trial court on the motion to strike clearly is insufficient to establish a prima facie case of actual malice, that is, to establish that Loftus, in making the alleged statements at the October 2002 conference, acted out of hatred or ill will toward plaintiff or that Loftus lacked a reasonable basis for believing in the truth of her statements. It is undisputed that at the October 2002 conference, Loftus did not reveal either Jane Doe's identity or the details of the "destructive behavior" that plaintiff's foster mother had revealed to Loftus—circumstances that seemingly belie the claim that Loftus acted out of hatred or ill will toward plaintiff. Further, although in her declaration plaintiff explicitly denies engaging in the specific instances of destructive behavior that Loftus alleges she learned from plaintiff's foster mother, plaintiff acknowledges in that declaration that her foster mother may have had concerns that she (plaintiff) had engaged in such conduct. The declaration filed by plaintiff's foster mother, although taking issue with Loftus's conduct in other respects, does not deny that the foster mother made such statements to Loftus. Under these circumstances, we conclude that plaintiff failed to establish a prima facie case that Loftus made the alleged defamatory statement in question out of hatred or ill will, or with reckless disregard for the truth of the statements.

Contrary to plaintiff's contention, the factors upon which plaintiff relies to support a claim of malice—principally Loftus's strongly held views on the repressed memory issue, Loftus's persistence in investigating the soundness of Corwin and Olafson's article despite plaintiff's objections, and Loftus's acknowledged displeasure with the ethical complaint that plaintiff filed against her with the University of Washington—are not sufficient to support a determination that Loftus acted with actual malice in making the alleged statements in question at the October 2002 professional conference. The qualified privilege embodied in Civil Code section 47, subdivision (c)(1) is intended to provide substantial protection to statements made on just such an occasion, and the circumstances relied upon by plaintiff fall far short of providing an adequate basis for finding that Loftus made these statements with actual malice. (Accord, *Weingarten v. Block* (1980) 102 Cal.App.3d 129, 144–151 [162 Cal.Rptr. 701].)

Accordingly, we conclude that plaintiff failed to establish a prima facie case with regard to a cause of action for defamation based upon the statements alleged to have been made by Loftus at the October 2002 conference.

In sum, we conclude that the Court of Appeal erred in permitting plaintiff's action to go forward with respect to Loftus's alleged statements at the October 2002 conference, either as a cause of action for public disclosure of private facts or for defamation.

## IV

We next address the Court of Appeal's holding that plaintiff properly could pursue a cause of action for improper public disclosure of private facts based upon Loftus's disclosure of the initials of plaintiff's first and last names at a deposition in an unrelated case. As we explain, we conclude that the Court of Appeal erred in determining that plaintiff had established a probability of prevailing on such a claim.

The facts underlying this claim can be briefly summarized. During a deposition in an unrelated case in which Loftus had been retained as an expert witness, a question arose regarding Loftus's recent move from a professorship at the University of Washington to a position at the University of California at Irvine, and the plaintiff's counsel in that proceeding asked Loftus whether she knew the name of the person who had filed a complaint against her with the University of Washington. Loftus answered: "I do know her name, but I would rather protect her privacy." The deposition continued as follows:

"Q: Can you give me the initials?

"A: Well, she's called Jane Doe in the article.

"Q: I see.

"A: But her real initials are N.T.

"Q: Okay.

"A: I mean, I just didn't want her name floating around in a public record."

As noted, the Court of Appeal held that Loftus's disclosure of plaintiff's initials could support a claim for improper public disclosure of private facts. The court based its determination on its view that plaintiff's identity was not a matter of public interest, and because the revelation of plaintiff's initials was a "clue" to the true identity of Jane Doe, the Court of Appeal concluded that "a reasonable jury could find that disclosing this information was both offensive and objectionable."

For several reasons, we disagree with the Court of Appeal's conclusion that Loftus's disclosure of plaintiff's initials during the deposition properly can provide support for a tort cause of action for improper public disclosure of private facts. First, even if we assume that the appellate court was correct in concluding that the *identity* of the subject of the case study discussed in the

Child Maltreatment article was not a matter of public interest—an issue that we need not, and do not, decide—we believe it is clear that the mere disclosure of plaintiff's initials could not properly be considered to constitute a public disclosure of her identity so as to support an action for public disclosure of private facts.[17]

Second, it is clear in any event that Loftus's disclosure of plaintiff's initials at the deposition cannot support a claim for improper disclosure of private facts because the deposition occurred on March 1, 2003, more than two weeks *after* plaintiff filed the initial complaint in the present case (on February 13, 2003) in which plaintiff herself provided *her full name* and identified herself as the person who had been identified as Jane Doe in the Child Maltreatment and Skeptical Inquirer articles. Thus, at the time of the deposition in question, plaintiff already had revealed her true identity, and Loftus's deposition answer clearly did not disclose a private fact whose revelation could be the basis for the imposition of liability under the public-disclosure-of-private-facts tort. (See, e.g., *Sipple v. Chronicle Publishing Co.* (1984) 154 Cal.App.3d 1040, 1047 [201 Cal.Rptr. 665] ["there is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public . . ."].)

Accordingly, the Court of Appeal erred in determining that Loftus's disclosure of plaintiff's initials during the deposition in question properly could provide support for a cause of action for public disclosure of private facts.

## V

We next consider the Court of Appeal's holding that plaintiff properly could proceed with a cause of action for a distinct invasion-of-privacy tort—the tort of intrusion into private matters—based upon defendants' allegedly improper action in obtaining confidential court records.

■ In our decision in *Shulman, supra,* 18 Cal.4th 200, 231, we explained that California decisions have adopted the formulation of the intrusion-into-private-matters tort set forth in section 652B of the Restatement Second of Torts: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." (Boldface omitted.) In briefly

---

[17] In this regard, we note that it is this court's practice to employ initials in order to *protect* the privacy of parties or other individuals in circumstances in which such protection is deemed appropriate. (See Cal. Style Manual (4th ed. 2000) §§ 5:9 to 5:13, pp. 179–181.)

encapsulating this formulation in *Shulman*, we stated that "the action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Shulman, supra*, 18 Cal.4th at p. 231.) As explained in *Shulman*'s full discussion of this tort, however, the opinion's concise two-part restatement of the elements of the tort was not intended to alter either the Restatement's requirement that the intrusion upon another's privacy be *intentional*, or the Restatement's recognition that the tort includes not only highly offensive intentional intrusions into another person's private place or conversation but also highly offensive intentional intrusions upon another person's *private affairs or concerns*. With regard to the latter point, the opinion in *Shulman* observed: "To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, *or obtained unwanted access to data about*, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation *or data source*." (*Id*. at p. 232, italics added.)

As noted, plaintiff contended in the Court of Appeal that she had established a prima facie case for purposes of the intrusion-into-private-matters tort based upon defendants' action in collecting and utilizing private information concerning plaintiff contained in both public and confidential court files. The Court of Appeal recognized that plaintiff's claim is untenable insofar as it is based upon defendants' examination and disclosure of medical or other reports contained *in court records that are open to the public*, even if the information in the reports otherwise might be thought of as private information. (See, e.g., *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 692 [21 Cal.Rptr.3d 663, 101 P.3d 552], quoting *Cox Broadcasting Corp. v. Cohn* (1975) 420 U.S. 469, 495 [43 L.Ed.2d 328, 95 S.Ct. 1029] [" 'the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection' "]; *Shulman, supra*, 18 Cal.4th 200, 231.) The Court of Appeal went on to hold, however, that the record before the trial court could support a claim that defendants obtained private information *from court records* in Solano County relating to plaintiff's juvenile dependency file *that were not open to the public*, and the Court of Appeal found that a cause of action for intrusion into private matters could be based upon such alleged conduct.

In reaching the latter conclusion, the Court of Appeal relied upon a statement contained in a declaration filed by Harvey Shapiro, whose private investigation company, Shapiro Investigations, had been hired by Loftus to search court records in Solano County. In his declaration, Shapiro stated that one of his assistants had copied "voluminous *public* records" on file in the Solano County court. In concluding that this statement was sufficient to establish a prima facie case that defendants had obtained information from confidential court files, the Court of Appeal apparently assumed that the only

court records in Solano County that contained information regarding plaintiff were confidential juvenile dependency records relating to her. Based on this assumption, the Court of Appeal determined that although Shapiro's declaration explicitly referred only to his assistant's examination of "public records," the declaration nonetheless would support a conclusion that defendants somehow had obtained copies of *confidential* court records in Solano County.

After the Court of Appeal filed its opinion, defendants sought rehearing in that court on the ground that the appellate court's conclusion on this issue was based on an erroneous premise. In conjunction with the rehearing petition, defendants requested that the Court of Appeal take judicial notice of voluminous records from a number of non-juvenile-dependency proceedings in Solano County—including a guardianship proceeding and a wrongful death action brought on plaintiff's behalf—that are properly open to the public and that contain substantial information relating to plaintiff. The Court of Appeal denied rehearing as well as the request for judicial notice.

■ After we granted review, defendants filed a motion requesting that this court take judicial notice of the records in question. Under Evidence Code section 452, a court may take judicial notice of the records of any court of this state, and the records in question are relevant to the question whether plaintiff has presented sufficient evidence to establish a prima facie case that defendants improperly obtained private information about plaintiff from *confidential* court records. Accordingly, we have granted the motion to take judicial notice of the proffered court records.

In light of the court records from Solano County presented by defendants, we conclude that the Court of Appeal erred in suggesting that the Shapiro declaration itself would support a conclusion that defendants collected information about plaintiff from confidential court records. The Solano County records in question are court records that are open to the public and that contain numerous references to plaintiff's true identity and also identify Cantrell as plaintiff's foster mother. (The wrongful death action that is included in the Solano County court records was filed on behalf of plaintiff by Cantrell as plaintiff's guardian ad litem.) Plaintiff failed to present any evidence in opposition to the motion to strike that would indicate that Shapiro, his assistant, or anyone else improperly obtained access to *confidential* court files.

Under these circumstances, we conclude that the Court of Appeal erred in holding that plaintiff had established a prima facie case of intrusion into private matters based upon defendants' collection and dissemination of information contained in the Solano County court records.

## VI

Finally, we reach what appears to be plaintiff's most substantial claim—the claim that Loftus committed the tort of intrusion into private matters in obtaining personal information about plaintiff from plaintiff's former foster mother, Margie Cantrell, by intentionally misrepresenting her (Loftus's) relationship with Corwin. The Court of Appeal held that the evidence before the trial court was sufficient to permit this cause of action to go forward.

The facts relevant to this claim are contained in three declarations that were before the trial court: (1) a declaration of Cantrell, filed in conjunction with the opposition to the motion to dismiss; (2) a supplemental declaration of Loftus, filed in conjunction with the reply to the opposition; and (3) a declaration by Harvey Shapiro (the private investigator whose company was hired by Loftus, who arranged a meeting between Loftus and Cantrell), filed in support of the motion to dismiss. As we shall see, the version of the relevant events set forth in Cantrell's declaration sharply conflicts with the version described in the Loftus and Shapiro declarations.

In her declaration, Cantrell states that she was plaintiff's foster mother in the early 1990's during plaintiff's adolescence, that she met Corwin during this period and "knew that he and Nicole had a professional relationship related to her past history of child abuse and the painful breakup of her parents' marriage," and that she "found Dr. Corwin to be polite and respectful and considerate of Nicole's feelings." Cantrell further states that in late 1997 she was contacted by Loftus, who allegedly represented to Cantrell "that she was working with David Corwin, M.D. to help Nicole" and who asked Cantrell "to come down to an office located in town to answer a few questions." Cantrell states in her declaration that "[g]iven my past contacts with Dr. Corwin, and my understanding of Nicole's trust in him, I accepted the invitation in order to help Nicole in any way that I could."

Cantrell indicates in her declaration that when she arrived for the interview with Loftus, Loftus was seated in a room with a man. When Cantrell entered and introduced herself, "Dr. Loftus smiled and welcomed me, saying again that she was working with Dr. Corwin and was actually his supervisor in connection with the study of Nicole." According to Cantrell's declaration: "Dr. Loftus asked if she could record the interview on audiotape," and "relying entirely on [Loftus's] representations that she worked with Dr. Corwin," Cantrell agreed. The declaration continues: "The questioning lasted several hours I believe. During the course of the interview the questioning about Nicole seemed to become increasingly hostile. I became concerned and asked Dr. Loftus if she really worked with Dr. Corwin or something to that effect. . . . I recall that my confrontation caused a reaction on the part of both

the man and the woman. I told them that I felt that they had not been honest with me and asked them what they were really doing. They did not respond. I became frightened. . . . I demanded that they turn the recording machine off. I believe that they did so. . . . I demanded that they give me the tape. They refused. . . . I left immediately, extremely upset."

Cantrell further states in her declaration that after subsequently learning from Corwin that Loftus was not associated with him, "I felt humiliated because I had been talking about Nicole's confidential matters with someone I was led to believe was bound to respect her confidentiality." Cantrell states that "[s]ince this incident, Nicole and I have become estranged," and that "I am informed that, because of the interview, Nicole believes that I am no longer trustworthy. This saddens me deeply." Cantrell further indicates that "I would never have consented to be interviewed by [Loftus] if she had disclosed her true identity and focus and would have said nothing about Nicole without Nicole's full knowing and voluntary consent."

After the Cantrell declaration was filed, Loftus filed a supplemental declaration that stated in relevant part: "I unequivocally deny that I ever represented myself to Ms. Cantrell—or anyone else—as 'working with David Corwin, M.D.' or that I in any way implied or suggested that I was his 'supervisor' or words to this effect. Ms. Cantrell may possibly have misunderstood me when I undoubtedly mentioned Dr. Corwin's interviews with Plaintiff. However, again, I in no way represented myself as associated with Dr. Corwin nor would I."

Loftus's supplemental declaration continues: "Further, as the interview with Ms. Cantrell was never tape-recorded—nor, to my knowledge, was a tape-recorder even present—the statements in the declaration . . . that refer to a tape-recording simply make no sense. Finally, in her declaration, Ms. Cantrell declares that the interview became 'hostile' and that she became 'frightened' and that she was 'extremely upset' and that she left 'immediately.' This characterization of our interview is entirely inconsistent with my recollection of our lengthy interview that day which was concluded when Ms. Cantrell posed for photographs with Mr. Shapiro who she knew already and with me."

The Shapiro declaration, which was filed prior to Cantrell's declaration as an exhibit to defendants' initial motion to strike, provides additional information regarding the events leading up to Loftus's interview with Cantrell. In his declaration, Shapiro states that Cantrell first came to his office in July 1997, prior to and with regard to a matter totally unrelated to the matter in which he subsequently was hired by Loftus. In September 1997, Loftus contacted Shapiro and requested his help in identifying the Jane Doe referred

to in the Corwin article, involving a case that Loftus believed may have originated in Solano County. Shapiro assigned one of his assistants to search public records at the Solano County Clerk's Office, and in searching relevant court records the assistant discovered a name (Margie Cantrell) that was familiar to the assistant. In a subsequent telephone conversation between Shapiro and Loftus, Loftus expressed interest in meeting Cantrell, and Shapiro's declaration states that "[s]erendipitously, Ms. Cantrell was in my office speaking to one of my staff, during my conference with [P]rofessor Loftus."

Shapiro's declaration continues: "When [P]rofessor Loftus asked if I could arrange a meeting between Professor Loftus and Ms. Cantrell, I immediately went to where Ms. Cantrell was speaking with one of my staff and asked Ms. Cantrell if she would be willing to discuss her work as a foster mother with a friend of mine. . . . Ms. Cantrell was delighted to speak about her work as a foster mother and agreed to meet within the next few days. . . . Several days later, on September 27, 1997, my assistant . . . , [P]rofessor Loftus, and I met with Ms. Margie Cantrell, in my Fairfield, California office. . . . Ms. Cantrell was delighted to be interviewed, provided four hours of information and gave [P]rofessor Loftus a great many details, including names, addresses and such of and concerning Plaintiff Nicole Taus." Finally, the Shapiro declaration additionally states: "Subsequent to her interview, Ms. Cantrell returned to my office with photos and more information of and concerning Plaintiff Nicole Taus."

As these declarations reveal, there is a sharp conflict in the evidence in the record regarding whether Loftus represented herself to Cantrell as working with or associated with Dr. Corwin. Cantrell asserts that Loftus repeatedly made such a representation; Loftus vigorously denies making any such representation. At the present stage of the proceeding, we have no occasion to resolve this conflict. As we have explained above (*ante,* at pp. 713–714), under the standard set forth in past cases interpreting and applying section 425.16, an action may not be dismissed under this statute if the plaintiff has presented admissible evidence that, if believed by the trier of fact, would support a cause of action against the defendant. (See, e.g., *Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th 811, 821.) Accordingly, although it is certainly possible that a trier of fact could find that Cantrell's version of the asserted events has been distorted by her acknowledged desire to regain the lost trust and confidence of plaintiff (her former foster daughter), at this juncture our role is limited to determining only whether, if the trier of fact were to find that Loftus made the alleged misrepresentations to Cantrell in order to obtain personal information concerning plaintiff and obtained such information by virtue of those misrepresentations, this conduct would be sufficient to support a cause of action by plaintiff for the tort of intrusion into private matters.

As discussed above, in order to prevail on an intrusion-into-private-matters cause of action, a plaintiff must establish that the defendant intentionally intruded into a private place, conversation, or matter in a manner highly offensive to a reasonable person. (See, *ante*, at pp. 724–725; *Shulman, supra*, 18 Cal.4th 200, 231.) Further, as explained in *Shulman*, "[t]o prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." (18 Cal.4th at p. 232.)

The initial question is whether the asserted facts demonstrate that Loftus intruded into a private place, conversation, or matter as to which plaintiff possessed a reasonable expectation of privacy. Loftus's alleged conduct did not involve entering a private place such as plaintiff's home or hospital room or tapping her phone, but rather interviewing her former foster mother (Cantrell), whose identity Loftus learned from publicly available court records. Defendants contend that plaintiff had no "objectively reasonable expectation of seclusion or solitude" in the "data source" here, because Cantrell was free to disclose sensitive and personal facts that she knew about plaintiff.

In support of this contention, defendants rely on, among other cases, *Humphers v. First Interstate Bank* (1985) 298 Ore. 706 [696 P.2d 527] (*Humphers*), a leading decision in this area authored by Justice Hans Linde. In *Humphers*, the plaintiff was a biological mother who had given up a daughter for adoption and had not generally revealed the matter to others, relying on state law providing confidentiality for such adoption records. When the daughter was 17 years of age, she sought and found the physician who had admitted her mother to the hospital. The physician agreed to help the daughter find her biological mother, revealed the mother's prior name to the daughter, and also prepared a false statement indicating that the physician had administered a medication to her mother that made it important for the daughter to locate her biological mother. Using the statement provided by the physician, the daughter was able to obtain the sealed medical records of the adoption, and then ultimately was able to locate her biological mother. The biological mother was very upset by this development, allegedly suffering emotional distress, humiliation, embarrassment, and an inability to function normally, and thereafter brought the action in question against the estate of her former physician (who had died in the interim), seeking to recover on a variety of causes of action, including one for breach of confidence and another for offensive intrusion upon her privacy, based upon the physician's disclosure of the mother's identity to her daughter.

In *Humphers*, the Oregon Supreme Court concluded that, on these facts, the mother could recover from the physician's estate for *breach of confidence*, but that a cause of action would *not* lie for *improper intrusion*. The court in *Humphers* held that although a defendant who was under a legal obligation not to reveal information—as was the physician in this case, because the information was confidential and privileged—could be held liable for breach of confidence, when information known by one person concerning another person is not protected under the law by any such rule of confidentiality, the person who reveals the information cannot be held liable for unauthorized intrusion upon privacy, because he or she is under no legal obligation to keep the information private. (See *Humphers, supra,* 696 P.2d 527, 529–533.)

The decision in *Humphers, supra,* 696 P.2d 527, is distinguishable from the present case in a significant respect. In *Humphers*, the intrusion-into-private-matters action was brought against the person who revealed the information (there, the physician), and the court's rejection of a cause of action for intrusion was based on a reluctance to define the intrusion tort so expansively as to impose liability upon a person simply for revealing information that the person was under no specific legal obligation to maintain confidential. (See *id.* at pp. 529–530, 532–533.) In the present case, by contrast, plaintiff is not suing Cantrell—the person who disclosed the personal information about her—but rather is suing an investigator who allegedly utilized a misrepresentation to obtain personal information concerning plaintiff from Cantrell. The rationale underlying the court's rejection of an intrusion cause of action in *Humphers* does not necessarily apply to the present setting. Indeed, the court in *Humphers* was careful to point out in its opinion that although "[t]he [intentional] use of a false medical document to gain access to the [mother's medical] records" might well give rise to liability, "[the plaintiff's daughter] is not a defendant here, and the complaint does not allege that she asked [the doctor] to prepare a false letter or knew that it was false." (*Humphers, supra,* 696 P.2d 527, 533, fn. 13.)

Accordingly, although we agree, as *Humphers* and numerous other cases teach, that a person generally has no right to maintain an action for improper intrusion against a relative or close friend for voluntarily disclosing personal information about him or her to another, it does not necessarily follow that no violation of a person's reasonable expectation of privacy occurs when a third party—for example, a private investigator—obtains access to personal information about the person from his or her relatives or friends by utilizing improper and unanticipated means, particularly when such information would not have been disclosed by the relative or friend absent the third party's use of such means. As a matter of common experience, there is a significant difference between the disappointment one feels when a relative or friend reveals one's personal secrets, and the affront to one's personal integrity and individual dignity (see *Shulman, supra,* 18 Cal. 200,

231) that results when a third party, with whom one has no personal relationship, uses improper and unauthorized means to obtain access to such personal, private information. As we pointed out in *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 916 [85 Cal.Rptr.2d 909, 978 P.2d 67] (*Sanders*), "privacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law." In *Sanders* itself, we held that an employee who lacked a reasonable expectation of complete privacy in workplace conversations because they could be seen and overheard by coworkers (but not by the general public) nonetheless could maintain a cause of action for intrusion into private matters against a television reporter who, in pursuit of a story, obtained employment in the workplace and thereafter covertly videotaped numerous workplace conversations. (20 Cal.4th at pp. 914–923.)

As already noted, in discussing the intrusion-into-private-matters tort in *Shulman, supra*, 18 Cal.4th 200, 230–232, we explained that the California decisions applying this tort have drawn heavily upon the description of the tort in section 652B of the Restatement Second of Torts. One of the illustrative examples accompanying this section makes clear that an action for intrusion properly can be based upon a defendant's obtaining personal information about the plaintiff from another person or entity by improper means. Illustration 4 of comment *b* to section 652B states: "A is seeking evidence for use in a civil action he is bringing against B. He goes to the bank in which B has his personal account, exhibits a forged court order, and demands to be allowed to examine the bank's records of the account. The bank submits to the order and permits him to do so. A has invaded B's privacy." (Rest.2d Torts, § 652B, com. b, pp. 378–379; see also, e.g., *Zimmermann v. Wilson* (3d Cir. 1936) 81 F.2d 847, 849 [one of the cases upon which illustration 4 is based: "We rest on substance when we regard the rights of Zimmermann and his wife . . . as the real parties in interest . . . , and their bankers and brokers as mere agents. . . . It is the information the bankers' books contain, and not the books in which that information is recorded, that is the property right . . . this court protects by injunctive relief. . . . [W]e regard the search here asserted as a violation of the natural law of privacy in one's own affairs which exists in liberty loving peoples and nations"]; *Swarthout v. Mutual Service Life Ins. Co.* (Minn.Ct.App. 2001) 632 N.W.2d 741, 745 [action for intrusion could be maintained against insurance company that, without the insured's permission, added the names of an additional physician and medical clinic to a medical release form signed by the insured, and that employed the altered form to obtain medical information from those additional sources]; *Corcoran v. Southwestern Bell Tel.*

*Co.* (Mo.Ct.App. 1978) 572 S.W.2d 212, 215–216 [actionable intrusion tort stated where defendant obtained plaintiff's phone bill from the telephone company by deception and opened the bill without plaintiff's permission].)

Although none of the foregoing cases involved an instance in which a defendant utilized a misrepresentation or some other improper means to obtain private information about a person *from a relative or friend* (rather than, for example, from a bank or telephone company), nothing in those cases suggests that a person forfeits his or her reasonable expectation of privacy in the "private affairs or concerns" that the intrusion tort was designed to protect (Rest.2d Torts, § 652B) by, for example, storing private papers or sharing very personal information with a relative or close friend. Although in such an instance the person assumes the risk, for purposes of the intrusion tort, that the relative or friend may betray his or her confidence by voluntarily disclosing the information, there is no reason to conclude that the person does not retain a reasonable expectation of privacy that may be violated when a third party defendant, by intentionally engaging in improper and unforeseen conduct, gains unauthorized and unwanted access to such information from such a relative or friend. Just as the plaintiff in *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th 907, retained a reasonable expectation of privacy that was violated when his conversations with coemployees in a nonpublic workplace were covertly videotaped by an undercover journalist, and just as a person retains a reasonable expectation of privacy that is violated when a third party defendant, by wiretapping a phone conversation or surreptitiously recording an in-person conversation, gains access to private information that the person has chosen to share with another person, a person similarly retains a reasonable expectation of privacy that may be violated when a third party defendant, by engaging in improper and unforeseen conduct, gains access to private information about the person from the person's relative or friend.

As a general matter, of course, a person's relatives and close friends frequently are privy to a great deal of the person's most private personal and family secrets—including, for example, potentially embarrassing and harmful information concerning the person's medical condition, the person's sexual activities and orientation, whether the person has been subjected to sexual or physical abuse either within his or her family or otherwise, and the person's youthful indiscretions or misbehavior. Unlike a person's appearance or activities that occur in a public place (see, e.g., *Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 162–163 [269 Cal.Rptr. 379]), and unlike personal information about a person that is contained in a public record open to inspection by the general public as a matter of law (Rest.2d Torts, § 652B, com. c., pp. 379–380; *Gates v. Discovery Communications, Inc., supra,* 34 Cal.4th 679, 692), personal information about a person that happens to be known by the person's relatives or close friends is not

information that has entered the public domain. A person's interest in preserving the privacy of such information—the very interest the intrusion tort was designed to protect—would be substantially undermined if a would-be investigator could employ any means whatsoever to extract or obtain such private information from a relative or close friend.

To put forth a few extreme examples, it is clear that a person's reasonable expectation of privacy would be violated if a private investigator—who was determined to obtain private information about the person that was otherwise unavailable to the investigator—broke into the home of a relative or close friend of the target of the investigation and copied a diary or other private papers that the target had left with the relative or friend for safekeeping, or, alternatively, physically threatened, blackmailed, wiretapped, hypnotized, or administered a drug to such a relative or friend to obtain private information about the target that the relative or friend would not have voluntarily disclosed. (See, e.g., *Sheets v. Salt Lake County* (10th Cir. 1995) 45 F.3d 1383, 1388 [holding that the plaintiff husband had a reasonable expectation of privacy in entries in his wife's diary that related to him: "The fact that Mr. Sheets did not author the information does not prohibit him from having a distinct privacy interest in the dissemination of information written about the personal aspects of his life. . . . [¶] . . . We find that information conveyed to one's spouse or that one's spouse has observed about one's character, marriage, finances, and business to be personal in nature and subject to a reasonable expectation of privacy"].)[18] Although in each of those instances

---

[18] In *Sheets v. Salt Lake County, supra,* 45 F.3d 1383, the reasonable-expectation-of-privacy issue arose in the context of a federal civil rights action filed by the plaintiff husband against the defendant county, based on the disclosure by the county sheriff's office of the contents of his wife's diary that had been obtained by the sheriff in connection with a murder investigation. In *Sheets,* the federal circuit court concluded that the husband could maintain an action for violation of his constitutional right of privacy, because he had a reasonable expectation of privacy with regard to the personal information relating to him contained in his wife's diary.

Although the holding in *Sheets* rested upon the scope of the federal constitutional right of privacy rather than of the common law intrusion tort, we believe the court's conclusion in *Sheets* nonetheless is relevant to the issue before us. In our view, there is no reason to suggest that the scope of an individual's reasonable expectation of privacy that is protected by the *common law* intrusion-into-privacy tort is *less* extensive than the scope of the reasonable expectation of privacy that qualifies for *constitutional* protection under the federal Constitution. The common law intrusion tort was developed to provide a remedy for highly offensive intrusions upon privacy that otherwise would go unredressed (see generally Prosser, *Privacy* (1960) 48 Cal. L.Rev. 383, 389–392), and, as a matter of logic and reason, this common law remedy properly should apply to intrusions upon privacy that do not necessarily rise to the level of a federal constitutional violation. Accordingly, in our view the decision in *Sheets* properly can be seen as providing support for the general proposition that, for purposes of the intrusion tort, a person may possess a reasonable expectation of privacy in personal information about him or her that is known to the person's close relatives or friends—a reasonable expectation of privacy that may be violated when such information improperly is obtained by a third party.

the relative or friend would be able to pursue his or her own distinct tort cause of action against the private investigator, in many cases the most serious harm or damage will have been incurred by the person whose private information was the target of and the impetus for the intrusive misconduct, and the intrusion-into-private-matters tort is specifically intended to provide a remedy to the person who has sustained an invasion of his or her privacy by virtue of the misconduct. (Accord, *Zimmermann v. Wilson, supra,* 81 F.2d 847, 849 ["We rest on substance when we regard the rights of Zimmermann and his wife . . . as the real parties in interest . . . , and their bankers and brokers as mere agents. . . . It is the information the bankers' books contain, and not the books in which that information is recorded, that is the property right . . . this court protects by injunctive relief"].)

In the present case, Loftus was seeking to obtain from Cantrell, plaintiff's former foster mother, personal information about plaintiff relating both to plaintiff's memory of ostensible sexual abuse to which plaintiff had been subjected as a child by her mother, and to the effect of plaintiff's asserted recovery of that memory on plaintiff's subsequent behavior and emotional well-being—certainly the type of information as to which a person ordinarily would possess a reasonable expectation of privacy. (In this regard, it is relevant to recall that at the time Cantrell agreed to speak to Loftus about these matters, the fact that plaintiff was the "Jane Doe" referred to in Corwin and Olafson's 1997 Child Maltreatment article, or, indeed, the circumstance that plaintiff assertedly had been sexually abused as a child, was not a matter of general or public knowledge.) Furthermore, as revealed by Loftus's declaration, through her questioning of Cantrell, Loftus was able to obtain access to previously undisclosed information concerning plaintiff's alleged promiscuity and drug use following her 1995 session with Corwin—again, the kind of very personal and potentially embarrassing or detrimental information as to which a person ordinarily would possess a reasonable expectation of privacy.

Of course, unlike some of the hypothetical scenarios described above, in the present case Loftus did not obtain access to this very personal information about plaintiff by breaking into Cantrell's home or by wiretapping her telephone, but instead obtained the information by questioning Cantrell. Because plaintiff had agreed to permit Corwin to use her case study at educational seminars and in an article published in a scientific journal—albeit without identifying plaintiff by name—it may well be that plaintiff could not have had an objectively reasonable expectation that an investigator or academic researcher, like Loftus, would not discover her identity and pose probing questions to Cantrell relating to such personal matters. In any event, because, as explained below, as a matter of law Loftus's simple engagement in such questioning would not constitute "highly offensive" conduct (see *post,* at pp. 737–738), it is clear that plaintiff would have no cause of action under

the intrusion tort if, in response to such questioning by Loftus, Cantrell freely and voluntarily revealed this personal information about plaintiff to Loftus.

According to Cantrell's declaration, however, Loftus did not simply approach Cantrell with questions about plaintiff, but instead misrepresented her (Loftus's) relationship with Corwin (a psychiatrist with whom plaintiff had a friendly and trusting professional relationship)—stating that she (Loftus) was Corwin's associate or supervisor—in order to persuade Cantrell to disclose personal information about plaintiff to Loftus. If Loftus engaged in such behavior, we cannot say, as a matter of law, that such questionable and unorthodox action constitutes conduct that plaintiff reasonably should have foreseen or anticipated. Instead, we believe a jury could find that plaintiff reasonably expected that an investigator would not seek and obtain access to such personal information about her from a relative or friend *by falsely posing as an associate or supervisor of a mental health professional in whom plaintiff had confided.*

As we explained in *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th 907, 918, "[p]rivacy, for purposes of the intrusion tort[,] must be evaluated with respect to the identity of the alleged intruder and the nature of the intrusion." Taking those factors into account, we believe that a jury reasonably could find that if, as Cantrell asserts, Loftus obtained private, personal information about plaintiff by misrepresenting herself to Cantrell as Corwin's associate or supervisor, Loftus's conduct violated plaintiff's reasonable expectation of privacy. (Accord, *Sanders, supra,* 20 Cal.4th at p. 926 ["Because . . . the reasonableness of a privacy expectation must be assessed in reference to the identity of the intruder and the nature of the claimed intrusion, the proper question for the jury to decide was, indeed, whether plaintiff could reasonably expect he would not be secretly videotaped in his internal workplace interactions by a representative of the mass media"].)[19]

---

[19] At oral argument, defendants' counsel suggested that Loftus's alleged conduct should not be viewed as a violation of plaintiff's reasonable expectation of privacy under the particular facts of this case, because plaintiff assertedly was "estranged" from Cantrell at the time Loftus interviewed Cantrell. We believe this argument lacks merit for a number of reasons. First, although the record indicates that plaintiff had left Cantrell's home and no longer was residing with her at the time Loftus approached Cantrell, the record certainly does not establish, as a matter of law, that Cantrell felt so estranged from plaintiff at that time that plaintiff reasonably could have no expectation that Cantrell would respect her privacy with regard to information concerning the childhood sexual abuse allegedly sustained by plaintiff at the hands of her mother. On the contrary, Cantrell's declaration states that at the time Loftus approached her, Cantrell was very much concerned with respecting plaintiff's privacy and would not have disclosed to Loftus information relating to plaintiff's personal life had Cantrell known that Loftus was not associated with Corwin. Thus, as a factual matter, this contention cannot be sustained.

Second, even if a jury were to find that plaintiff's separation from Cantrell diminished plaintiff's reasonable expectation that Cantrell would not *voluntarily* disclose private informa-

The question remains whether a trier of fact properly could determine that the alleged conduct here at issue constituted "highly offensive conduct" that can be the basis for tort liability, or whether, as a matter of policy, such conduct should be considered, as a matter of law, not highly offensive for purposes of the intrusion tort.

In discussing this general subject in *Shulman, supra,* 18 Cal.4th 200, 236–237, our decision explained that the use of " ' "routine . . . reporting techniques," ' such as asking questions of people with information ('including those with confidential or restricted information') could rarely, if ever, be deemed an actionable intrusion." (*Shulman, supra,* 18 Cal.4th at p. 237; accord, e.g., *Smith v. Daily Mail Publishing Co.* (1979) 443 U.S. 97, 103 [61 L.Ed.2d 399, 99 S.Ct. 2667] [the First Amendment protects the right of journalists to obtain information using "routine newspaper reporting techniques"].) At the same time, we observed in *Shulman* that "violation of well-established legal areas of physical or sensory privacy—trespass into a home or tapping a personal telephone line, for example—could rarely, if ever, be justified by a reporter's need to get the story. . . . [¶] Between these extremes lie difficult cases . . . ." (*Shulman, supra,* 18 Cal.4th at p. 237.)

As already noted, in the present case the investigative conduct of Loftus at issue consisted of asking questions of a person who possessed information concerning plaintiff rather than intruding into plaintiff's home or tapping her phone. As the passage from *Shulman, supra,* 18 Cal.4th 200, 237, quoted above, makes clear, Loftus would not be subject to liability under the intrusion tort if she simply posed questions concerning plaintiff to Cantrell—even questions probing into highly personal matters relating to plaintiff—and Cantrell voluntarily had provided such information. As we have seen, however, Cantrell's declaration asserts that Loftus did not simply inquire about plaintiff but rather misrepresented her (Loftus's) relationship with Corwin—stating she was Corwin's associate or supervisor—in order to obtain sensitive information concerning plaintiff. Loftus, as we have noted, emphatically denies making any such misrepresentation, but in view of the procedural posture of this case we are limited to determining only whether, if a jury were

---

tion about her to others, it would not follow that a jury could not find that Loftus's conduct nonetheless violated plaintiff's reasonable expectation of privacy. As explained above, even if plaintiff could not have had a reasonable expectation that Cantrell would not voluntarily disclose such information, a jury could find that plaintiff reasonably could expect that an unrelated investigator—like Loftus—would not engage in the unorthodox and improperly intrusive conduct of persuading Cantrell to reveal personal information about her by intentionally misrepresenting herself as an associate of Corwin (a psychiatrist trusted by plaintiff and to whom plaintiff already had disclosed information related to her memories of the sexual abuse she ostensibly had suffered as a child).

to find that Loftus made such a misrepresentation to Cantrell, tort liability could be imposed on Loftus for improper intrusion on plaintiff's privacy.

An amicus curiae brief filed in this court on behalf of a number of news media entities and organizations cautions against permitting a cause of action for intrusion to be based solely on uncorroborated allegations—made by a "source" interviewed by a reporter or other investigator—that assert the reporter or investigator obtained information from the source through misrepresentation. The amicus curiae brief argues that in many instances in which a reporter utilizes information obtained from a source to write an article that the source ultimately is unhappy with, the source may claim, after the fact, that the reporter—to obtain the information disclosed in the article—failed to be forthright in disclosing his or her motives, position, or point of view to the source.[20] The brief maintains that permitting a subject about whom unflattering information has been obtained from a third party source to sue the reporter or investigator for offensive intrusion into the subject's privacy on the basis of such a claim of misrepresentation would have an undesirable chilling effect on the gathering and publication of newsworthy material.[21] The amicus curiae brief points to a number of cases that have rejected a cause of action for intrusion based on information revealed by a third party, even in circumstances in which the plaintiff alleged that a reporter or investigator employed some sort of fraud or subterfuge to obtain the information. (See, e.g., *Desnick v. American Broadcasting Companies, Inc.* (7th Cir. 1995) 44 F.3d 1345, 1351–1355; *Rifkin v. Esquire Publ'g* (C.D.Cal. 1982) 1982 U.S.Dist. Lexis 18405.)

The concerns raised by the amicus curiae brief appear quite reasonable and clearly demonstrate the danger and inadvisability of adopting a broad rule under which any type of misrepresentation by a reporter, investigator, or scholar to obtain information would be considered sufficient to support a cause of action for intrusion into private matters.

■ At the same time, however, we believe it is important to recognize that there are at least some types of misrepresentations that are of such an especially egregious and offensive nature—and are quite distinguishable from

---

[20] The amicus curiae brief states in this regard: "When the subject of an unflattering or critical news report complains to a source of information for that report who allegedly revealed private or injurious information to a reporter, it creates a motive for the source to belatedly contend that the reporter obtained the information by misrepresentation; that the reporter agreed to treat the information as 'off-the-record'; that the source was misquoted; that the source's statement was taken out of context; or that the reporter engaged in some other alleged misconduct to procure the information."

[21] "[F]rom a reporter's perspective, the decision below renders a conversation between a reporter and a source a veritable minefield from which any reporter might be wise to withdraw."

the types of ruses that ordinarily may be employed in gathering news—that they properly may be considered "beyond the pale" for purposes of the intrusion tort, even when the misrepresentation is made to friends or relatives of the subject of an inquiry who are under no legal obligation not to reveal private information about the subject of the inquiry. For example, consider an instance in which an unscrupulous or overly ambitious investigative reporter or private investigator, interested in discovering whether a public official (or any other person) has a particular medical condition or is taking a specific medication, makes a telephone call to a spouse, adult child, or close friend of the official, pretends to be an emergency room physician or paramedic, and asks the relative or friend to disclose the medical information ostensibly to assist in the treatment of the official. Even though (1) a public official's right of privacy is limited in many respects, (2) the information in question, because of the official's position, might well be considered "newsworthy" for publication purposes, and (3) the relative or friend might be under no legal obligation to keep the information confidential, we believe a jury reasonably could find that this type of misrepresentation is "highly offensive" to a reasonable person and that the subject of the inquiry had an "objectively reasonable expectation of seclusion or solitude in the . . . data source" (*Shulman, supra,* 18 Cal.4th 200, 232) that was violated by the investigator's use of such a tactic to obtain private information from a relative or friend who would not have divulged the information but for the flagrant nature of the misrepresentation.

The alleged misrepresentation at issue in the present case, of course, is not as egregious as that described in the foregoing hypothetical example, but the asserted misrepresentation in question nonetheless is of a particularly serious and potentially offensive nature that does share a number of the troubling aspects of that hypothetical. As noted, Cantrell's declaration states that Loftus misrepresented herself as associated with—indeed even the supervisor of— Corwin, a psychiatrist in whom Cantrell knew plaintiff had confided and with whom plaintiff had an ongoing, friendly professional relationship. Cantrell states in her declaration that Loftus's asserted misrepresentation led Cantrell to believe that Loftus "was bound to respect [plaintiff's] confidentiality" and that she (Cantrell) "never would have consented to be interviewed by [Loftus] if [Loftus] had disclosed her true identity and focus and [that she (Cantrell)] would have said nothing about [plaintiff] without [plaintiff's] full knowing and voluntary consent." And Loftus's declaration discloses that in the course of her interview with Cantrell, Cantrell revealed a number of highly private matters regarding plaintiff that a parental figure who cared about her foster child's welfare ordinarily would not be expected to disclose to a stranger—for example, that in 1995, shortly after apparently recovering her memories of her childhood sexual abuse, plaintiff "started sleeping with boys and doing drugs."

In our view, intentionally misrepresenting oneself as an associate or colleague of a mental health professional who has a close personal relationship with the person about whom one is seeking information would be a particularly serious type of misrepresentation, and one significantly different from the more familiar practice of a news reporter or investigator in shading or withholding information regarding his or her motives when interviewing a potential news source. Special legal protection is provided to information communicated in the course of a physician-patient or psychotherapist-patient relationship (Evid. Code, §§ 994, 1014), and even if plaintiff's relationship with Corwin was not of a nature that would bring information revealed to Corwin within an evidentiary privilege, the relationship bore a close similarity to such a relationship. Misrepresentations of this nature by either a reporter or an academic investigator could undermine legitimate professional relationships and would be especially troublesome, because they would take advantage of the desire and willingness of relatives and friends to provide assistance to professionals who they believe will use any personal information that is revealed to help the subject of the inquiry.

Because of these special and unusual considerations, we believe that if a trier of fact were to find that Loftus engaged in the particular type of misrepresentations alleged by Cantrell, the conduct properly could be found "highly offensive" for purposes of the intrusion-into-private-matters tort and liability could be imposed upon Loftus.[22]

Thus, we conclude that in light of the particular nature of the misrepresentation attributed to Loftus by the Cantrell declaration, the Court of Appeal

---

[22] In *Shulman, supra,* 18 Cal.4th 200, 236–237, in discussing the application of the offensiveness element in the context of activities engaged in by the news media, we stated that "[i]n deciding . . . whether a reporter's alleged intrusion into private matters . . . is 'offensive' and hence actionable as an invasion of privacy, courts must consider the extent to which the intrusion was, under the circumstances, justified by the legitimate motive of gathering the news. Information-collecting techniques that may be highly offensive when done for socially unprotected reasons—for purposes of harassment, blackmail or prurient curiosity, for example—may not be offensive to a reasonable person when employed by journalists in pursuit of a socially or politically important story."

A number of journalistic codes of ethics caution that "surreptitious methods of gathering information" should be avoided "except when traditional open methods will not yield information vital to the public." (Society of Prof. Journalists, Code of Ethics (1996) <http://spj.org/pdf/ethicscode.pdf> [as of Feb. 26, 2007]; see also Radio-Television News Directors Assn., Code of Ethics of Prof. Conduct <www.rtnda.org/ethics/coe.html> [as of Feb. 26, 2007] ["Professional electronic journalists should . . . [¶] . . . [¶] [u]se surreptitious newsgathering techniques . . . only if there is no other way to obtain stories of significant public importance and only if the technique is explained to the audience"]; Steele, *When Might It Be Appropriate to Use Deception/Misrepresentation/ Hidden Cameras in Newsgathering?* (Feb. 1, 1995) for Poynter Institute Ethics Series <http://www.poynter.org/content/content_view.asp?id=866> [as of Feb. 26, 2006] [listing, as

properly determined that the evidence presented by plaintiff is sufficient to establish a prima facie case under the intrusion-into-private-matters tort.[23]

---

one of the necessary prerequisites to the use of deception or misrepresentation in newsgathering, "[w]hen the information obtained is of profound importance. It must be of vital public interest, such as revealing great 'system failure' at the top levels, or it must prevent profound harm to individuals"].)

In the present case, of course, Loftus has denied engaging in any misrepresentation to obtain information from Cantrell (or anyone else), but defendants assert that even if Loftus made a misrepresentation to Cantrell, Loftus's actions should be considered, as a matter of law, *not* highly offensive, in light of plaintiff's consent to Corwin's use of her case study in educational seminars and a published article. Even if plaintiff's consent to the public use of her case study rendered her a limited public figure, however, that status would not in itself justify the use of the particular type of misrepresentation here at issue; as discussed above, even "all purpose" public figures (see *Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 263 [79 Cal.Rptr.2d 178, 965 P.2d 696]) such as public officials are entitled to be protected from having investigators conduct inquiries into their private information by pretending to be the public figure's physician or psychiatrist. (*Ante*, at pp. 738–739.)

Furthermore, although it is conceivable that there may be some circumstances in which the need for information is so vital that resort to even the type of very questionable investigative tactic here at issue could not properly be found to be highly offensive to a reasonable person, we believe it is clear that this case does not fall within that narrow category. Here, although the additional information concerning plaintiff that Loftus sought to obtain from Cantrell was newsworthy, there was no profound or overriding public need that, as a matter of law, justified resort to the particular type of potentially insidious stratagem that, according to Cantrell, was utilized by Loftus in this case. (Accord, *Shulman, supra,* 18 Cal.4th 200, 240 ["the fact that a reporter may be seeking 'newsworthy' material does not in itself privilege the investigatory activity"].)

[23] In reaching a contrary conclusion, the concurring and dissenting opinion mischaracterizes our discussion on a significant point and, in addition, ignores a key portion of the analysis of the reasonable-expectation-of-privacy element of the intrusion tort set forth in our decision in *Sanders, supra,* 20 Cal.4th 907.

First, contrary to the concurring and dissenting opinion's suggestion (*post*, at pp. 750–751), we have explained above that the information about plaintiff that Loftus sought to obtain and succeeded in obtaining from Cantrell—information relating to the ostensible sexual abuse to which plaintiff had been subjected as a child by her mother and to the detrimental effect of plaintiff's asserted recovery of that memory on plaintiff's subsequent behavior and emotional well-being—is the type of information as to which a person would possess a reasonable expectation of privacy (*ante*, at p. 735) and is information "that a parental figure who cared about her foster child's welfare ordinarily would not be expected to disclose to a stranger." (*Ante*, at p. 739.) Although the concurring and dissenting opinion points to another passage in our opinion to suggest a contrary conclusion, that passage does not support the concurring and dissenting opinion's reading. In that separate passage, after explaining that the record in this case does *not* support the claim that Cantrell was estranged from plaintiff at the time Loftus interviewed Cantrell, we state that "even if a jury were to find that plaintiff's separation from Cantrell *diminished* plaintiff's reasonable expectation that Cantrell would not *voluntarily* disclose private information about her to others, it would not follow that a jury could not find that Loftus's conduct nonetheless violated plaintiff's reasonable expectation of privacy." (*Ante*, at pp. 736–737, fn. 19, first italics added.) Contrary to the implication of the concurring and dissenting opinion, this passage does not indicate we have concluded that plaintiff did not

## VII

For the reasons discussed above, we conclude that the Court of Appeal erred in holding that plaintiff's action should be permitted to go forward with regard to (1) Loftus's alleged statements at the October 2002 conference relating to Jane Doe's position in the military, (2) Loftus's disclosure of plaintiff's initials at the March 2003 deposition, and (3) defendants' alleged action in obtaining information from confidential court records. At the same time, we also conclude that the Court of Appeal correctly determined that plaintiff's action for improper intrusion into private matters could proceed based upon the claim that Loftus obtained personal and sensitive information regarding plaintiff from her former foster mother by misrepresenting herself as an associate of Corwin, a psychiatrist with whom plaintiff had a close professional relationship.

Finally, although we have determined that defendants' motion to strike the complaint pursuant to the anti-SLAPP statute properly was denied as to one facet of one of the numerous causes of action alleged in the complaint, it is apparent when the determinations of the Court of Appeal and this court are viewed as a whole that the overwhelming majority of plaintiff's claims properly should have been struck in the trial court under the anti-SLAPP statute. Under these circumstances, and consistent with the fundamental purpose of the anti-SLAPP statute to minimize the chilling of conduct

---

possess a reasonable expectation of privacy in the information Loftus obtained from Cantrell. As explained, we conclude that plaintiff did possess a reasonable expectation of privacy with regard to such deeply personal information.

Second, in analyzing the reasonable-expectation-of-privacy prong of the intrusion tort, the concurring and dissenting opinion fails to take into account this court's explicit recognition in *Sanders, supra*, 20 Cal.4th 907, 918, that "[p]rivacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder *and the nature of the intrusion.*" (Italics added.) In *Sanders*, in rejecting a claim that the trial court had erred in its instructions to the jury on the reasonable-expectation-of-privacy element, we explained that "[t]he disputed instructions merely focused the jury's inquiry on the question whether it was reasonable for plaintiff to expect, in the circumstances of his particular workplace, that an interaction between coworkers would not be subject to covert videotaping by a television news producer. Because, as we have explained, the reasonableness of a privacy expectation must be assessed in reference to the identity of the intruder and the nature of the claimed intrusion, *the proper question for the jury to decide was, indeed, whether plaintiff could reasonably expect he would not be secretly videotaped in his internal workplace interactions by a representative of the mass media.*" (20 Cal.4th at p. 926, italics added.) In light of this clear explanation in *Sanders*, we believe it is entirely appropriate and consistent with governing precedent to describe the relevant reasonable-expectation-of-privacy question in this case as whether plaintiff reasonably could expect that an investigator would not seek and obtain access to personal information relating to her memory of childhood sexual abuse from her foster mother "*by falsely posing as an associate or supervisor of a mental health professional in whom plaintiff had confided.*" (*Ante*, at p. 736.) In questioning the opinion's analysis of this point, the concurring and dissenting opinion omits any discussion of the relevant portion of *Sanders*.

undertaken in furtherance of the constitutional right of free speech, we conclude that it is appropriate to award defendants their costs on appeal.

The judgment rendered by the Court of Appeal is reversed in part and affirmed in part, and the matter is remanded to that court for further proceedings consistent with this opinion. Defendants are awarded their costs on appeal.

Kennard, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring and Dissenting.—I agree with the majority in every respect except one: I respectfully disagree that Nicole Taus has an action against Elizabeth Loftus for the tort of intrusion into private matters (hereafter sometimes the intrusion tort), based on Loftus's alleged misrepresentations to Taus's foster mother, Margie Cantrell, in order to obtain supposedly private information about Taus. As explained below, Taus had no reasonable expectation that Cantrell would keep information she had observed about Taus's behavior private. Therefore, Taus should not be able to sue Loftus for unlawful intrusion. As also explained below, to the extent Taus preferred that Cantrell only speak to an investigator who held certain agreeable views, that preference could not be called an expectation of privacy, and the enforcement of that preference through tort law is antithetical to free academic inquiry.

I.

As discussed at greater length by the majority, plaintiff Taus became a case study in the recovered memory of sexual abuse through the work of psychiatrist Dr. David Corwin, who videotaped an interview in which Taus appears to recover the memory of sexual abuse disclosed on an earlier videotaped confession. Corwin described in considerable detail Taus's case, albeit preserving her anonymity by referring to her as Jane Doe, in an article in the May 1997 issue of Child Maltreatment, entitled *Videotaped Discovery of a Reportedly Unrecallable Memory of Child Sexual Abuse: Comparison With a Childhood Interview Videotaped 11 Years Before* (2 Child Maltreatment 91 (hereafter the Child Maltreatment article)). The article printed a transcript of interviews between Corwin and Taus regarding the asserted recovered memory, and the article and interview revealed the most private and intimate details of the sexual abuse Taus's mother allegedly inflicted on her and Taus's reaction to that abuse. (See maj. opn., *ante*, at pp. 693–694.) Other related articles in the same issue of Child Maltreatment posed followup research questions related to the case study, including " 'whether this experience has produced substantial changes in her life, for better or for worse.' " (Maj. opn., *ante*, at p. 695.)

During one of the interviews *and in the same published article*, Cantrell, who is referred to in the article as "foster mother," was also interviewed, and disclosed her observations of some highly personal and intimate facts about Taus's life, including her psychological condition, her relationship to her parents, and her adjustment to her new home. As Cantrell stated: "When Jane first approached our family to come and live with us she had been in several group homes, foster homes, her dad had become ill and she had to be placed somewhere. This was real traumatic for Jane . . . . When she first moved in, she was tragically headstrong. She had come to a point where you could not tell her anything. She didn't have rules or regulations and wouldn't succumb to any. Jane had basically decided to do everything all by herself, and no one was going to tell her what, why, or anything anymore . . . and Jane . . . just want[ed] to give up, . . . she said, 'I'm too chicken to commit suicide, but I just want out, I just, I want out, I can't take it anymore, because I don't know what happened to me when I was a little girl.' " Cantrell continued that she initiated Jane's getting back in touch with her mother: "Mother cried, and Jane cried, and Jane said 'It felt so good to have her hug me. I could tell that it was my mom.' " She then recounted how the relationship grew, but then, after her father's death, some things began to go wrong. "Jane experienced a few things that really upset her, and for no reason the mother would get really irate at her, and then just walk out of her life, and not call, and not come back. And Jane felt like a failure again, like something she had done, so Jane needed to know that there was nothing she had done." Cantrell opined during the interview that seeing the second video had been beneficial: "I think this has been a beautiful closure."

Elizabeth Loftus, a psychology professor long critical of the idea of recovered memory, did research on this case and co-authored an article skeptical of Corwin's conclusions entitled *Who Abused Jane Doe? The Hazards of the Single Case History* (May/June 2002) 26 Skeptical Inquirer 24, 37. Loftus was able, through lawful means, to discover that Taus was the Jane Doe of the Child Maltreatment article, in part because Corwin used Taus's first name and the city where she spent some of her childhood during a videotaped interview shown at a number of professional meetings. Loftus was able to contact and interview Taus's mother and Cantrell.

It is the latter interview that is central to Taus's intrusion cause of action. As explained by the majority, Cantrell stated in a declaration that Loftus misrepresented herself at the outset of the interview as working with Dr. Corwin and being "his supervisor in connection with the study of [Taus]." She asked to audiotape the interview, and as the questioning became increasingly hostile, Cantrell asked if Loftus "really worked with Dr. Corwin or something to that effect," and eventually broke off the interview. Cantrell asked for the audiotape but was refused and left "extremely upset." Loftus, in a declaration, adamantly denied making the above representations and denied audiotaping

the interview. Although Cantrell's declaration does not make clear what she revealed to Loftus about Taus, Loftus's declaration states "that Jane Doe's foster mother told me during my interview of her that shortly after apparently recovering her memories in 1995, Plaintiff started sleeping with boys and doing drugs. Plaintiff also snuck out of the house at night. And she apparently left the care of her foster mother." Based on this information, but without revealing the specifics mentioned in her declaration, Loftus stated at an academic conference that after the supposed recovered memory episode, "Jane Doe engaged in destructive behavior that I cannot reveal on advice of my attorney."

## II.

The anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16, protects the right to free speech and to engage in speech-related activities by making "a summary-judgment-like procedure available at an early stage of litigation that poses a potential chilling effect" on such activities. (Maj. opn., *ante*, at p. 714.) As the majority correctly concludes, Taus's action against Loftus falls within the scope of the activity protected by the anti-SLAPP statute, in that the activity that is the subject of the lawsuit was in furtherance of defendant's exercise of free speech. (Maj. opn., *ante*, at p. 712.) In order to defeat defendants' motion to strike, Taus must therefore establish a probability of prevailing on her complaint (Code Civ. Proc., § 425.16, subd. (b)(1)), i.e., she " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) The majority concludes from the facts stated above that Taus has made a prima facie showing that Loftus tortiously intruded into her privacy. In order to evaluate this conclusion, a precise understanding of the intrusion tort is necessary.

"[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 231 [74 Cal.Rptr.2d 843, 955 P.2d 469] (*Shulman*).) As to the first element, we have stated: "To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had *an objectively reasonable expectation of seclusion or solitude* in the place, conversation or *data source*." (*Id.* at p. 232, italics added.)

The determination of "an objectively reasonable expectation of seclusion" is contextual. In *Shulman*, for example, the court, relying in part on cases

related to privacy accorded hospital rooms and similar places, held that an injured person had the right to some degree of privacy in the interior of an ambulance. " '[I]t is neither the custom nor the habit of our society that any member of the public at large or its media representatives may hitch a ride in an ambulance and ogle as paramedics care for an injured stranger.' " (*Shulman, supra,* 18 Cal.4th at p. 233.) Also entitled to a degree of privacy were "conversations conveying medical information regarding [the patient] to the hospital base." (*Ibid.*) We acknowledged that a news cameraman "perhaps, did not intrude into that zone of privacy merely by being present at a place where he could hear such conversations with unaided ears. But by placing a microphone on [the paramedic's] person, amplifying and recording what she said and heard, defendants may have listened in on conversations the parties could reasonably have expected to be private." (*Ibid.*)

In arriving at this conclusion, we recognized the qualitatively greater intrusion represented by covert electronic recording: " 'While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or a mechanical device. [Citation.] [¶] . . . [S]uch secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.' " (*Shulman, supra,* 18 Cal.4th at pp. 234–235.)

In *Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907 [85 Cal.Rptr.2d 909, 978 P.2d 67] (*Sanders*), a television reporter obtained employment as a "telepsychic" and covertly videotaped conversations with several coworkers by means of a small video camera located in her hat. (*Id.* at pp. 920, 921.) One of those coworkers sued for intrusion. We rejected the notion that because the plaintiff's workplace was not absolutely secluded, the plaintiff had no expectation of privacy. "[P]rivacy, for purposes of the intrusion tort, is not a binary, all-or-nothing characteristic. There are degrees and nuances to societal recognition of our expectations of privacy: the fact that the privacy one expects in a given setting is not complete or absolute does not render the expectation unreasonable as a matter of law. . . . 'Like "privacy," the concept of "seclusion" is relative. The mere fact that a person can be seen by someone does not automatically mean that he or she can legally be forced to be subject to being seen by everyone.' " (*Id.* at p. 916.)

Cases that involve intrusion into a data source are rarer than cases involving intrusion into places or conversations and entail obtaining through improper means information protected by well-settled expectations of privacy and confidentiality. The majority cites three cases. In *Zimmermann v. Wilson*

(3d Cir. 1936) 81 F.2d 847, 849, the court held that an Internal Revenue Service agent's search of the plaintiffs' bank record through a subpoena duces tecum constituted an unreasonable search, concluding that such information should be considered a "property right" of the plaintiffs that could not be invaded without sufficient justification. This case is one of the ones on which illustration 4 of comment b to section 652B of the Restatement Second of Torts is based: "A is seeking evidence for use in a civil action he is bringing against B. He goes to the bank in which B has his personal account, exhibits a forged court order, and demands to be allowed to examine the bank's records of the account. The bank submits to the order and permits him to do so. A has invaded B's privacy." (Rest.2d Torts, § 652B, com. b, pp. 378–379.)

In *Swarthout v. Mutual Service Life Ins. Co.* (Minn.Ct.App. 2001) 632 N.W.2d 741, 745, the court allowed an action for intrusion when an insurance company added the names of additional health care providers to a medical release form signed by the insured without the latter's permission, thereby obtaining medical information it was not authorized to acquire. In *Corcoran v. Southwestern Bell Tel. Co.* (Mo.Ct.App. 1978) 572 S.W.2d 212, 215–216, the defendant diverted and opened the plaintiffs' mail, in clear violation of the law, in order to obtain the address of the plaintiffs' son, the defendant's ex-husband. It should be emphasized that although the information the defendant discovered in this case pertained to the plaintiffs' son, it was the plaintiffs who sued for invasion of privacy, not their son.

From the above case law, we can derive the following principles: First, it is insufficient to allege or prove that a defendant employed offensive means to breach what a plaintiff would like to be kept private or secluded in order to maintain an action for intrusion; a plaintiff must also establish that the defendant breached a zone that the plaintiff *reasonably* expects to remain private or secluded. The two inquiries are related but distinct. In *Shulman*, for example, the court could not have concluded that bringing the hidden recorder into an ambulance breached a reasonable expectation of privacy without first concluding that the interior of an ambulance and conversations between a paramedic and an injured person in need of the paramedic's services were reasonably entitled to some degree of privacy or seclusion. In *Sanders*, we concluded that hidden cameras brought into the workplace may constitute a breach of privacy (*Sanders, supra*, 20 Cal.4th at p. 923), but that the first prong of the intrusion tort is not met "when the plaintiff has merely been observed, or even photographed or recorded, in a public place." (*Id.* at p. 914.)

Second, a reasonable expectation of privacy or seclusion is one derived not only from law, but also from well-defined " 'custom [or] . . . habit of . . . society.' " (*Shulman, supra*, 18 Cal.4th at p. 233.)

Third, in order to maintain an intrusion action vis-à-vis a data source, as opposed to seclusion in a place or in communications, a plaintiff must reasonably expect, based on law, custom, or habit, that the information source will keep the information in relative secrecy *but for* the improper intrusion, and that the information itself will remain relatively private. In the cases and Restatement illustration discussed above, the plaintiffs attempted to keep the information private by entrusting it to institutions that had been assigned the role, through law, agreement, or well-developed custom, of being guardians of confidential information, such as banks and health care facilities. The breach of that confidentiality through deception or other improper means may support an action for invasion of privacy.

With these principles in mind, we turn to the present case.

## III.

At the outset, we must be clear that the question is not whether Cantrell had a reasonable expectation that her privacy would be breached by an investigator who got her to reveal private information under false pretenses. The question rather is whether Taus has a reasonable expectation that Cantrell's observations of Taus's behavior while acting as her foster mother would remain private. The majority cites no case for the proposition that person A has a reasonable, legally protectable expectation that person B will not reveal to person C observations person B has about person A's life. As we stated in *Shulman*, " '[O]ne who imparts private information risks the betrayal of his confidence by the other party . . . .' " (*Shulman, supra,* 18 Cal.4th at pp. 234–235.) An expectation of privacy is even less reasonable when what is at issue is not private information that has been communicated, in which some implication of confidentiality may sometimes arise, but rather disclosure of observations of a person's behavior. As one court observed, the intrusion tort "was not created to protect against . . . the garnering of information from third parties . . . . Gathering information about appellant from third parties, 'even if pursued using subterfuge and fraud, cannot constitute . . . an intrusion upon [appellant's] solitude or seclusion. The Court has found no authority, nor has [appellant] cited any, which suggests the contrary.' " (*Wolf v. Regardie* (D.C. 1989) 553 A.2d 1213, 1218, italics omitted; see also *MacKerron v. Madura* (Me. 1982) 445 A.2d 680, 682 [police officer's attempt to obtain letter from attorney's client may implicate the privacy interests of the client, but not the attorney].)

The majority cites *Sheets v. Salt Lake County* (10th Cir. 1995) 45 F.3d 1383 (*Sheets*), in support of its proposed expansion of the intrusion tort. In that case, the police requested and the plaintiff gave a copy of his deceased wife's diary in order to assist the investigation of her murder. Copies of the diary or

diary excerpts eventually wound up in the hands of several people who wrote books about the murder, one of whom quoted from the diary directly. In upholding a verdict in the plaintiff's favor pursuant to 42 United States Code section 1983, the court concluded that the husband had handed the diary over to the police with an understanding that it would be kept confidential, as evidenced both by assurances of confidentiality given by a police detective and by the fact that the diary was "traditionally reserved for the recording of private thoughts" and had been "given to the police for the specific purpose of aiding their investigation." (*Sheets, supra,* at p. 1388.)

*Sheets* does not assist the majority's position. The plaintiff in that case had a reasonable expectation that the diary would be kept private because of the confidential, legally enforceable relationship between himself and the police. In order to fit within *Sheets,* Cantrell would have had to have been under an obligation of confidentiality not to reveal sensitive information she knew about Taus at the time she met with Loftus, which the latter breached through deception. But no such obligation has been alleged. Moreover, Cantrell's observations and memory are not analogous to a diary or other traditional repository of private information.

Lacking precedent, the majority employs hypotheticals. The majority invites us to "consider an instance in which an unscrupulous or overly ambitious investigative reporter or private investigator, interested in discovering whether a public official (or any other person) has a particular medical condition or is taking a specific medication, makes a telephone call to a spouse, adult child, or close friend of the official, pretends to be an emergency room physician or paramedic, and asks the relative or friend to disclose the medical information ostensibly to assist in the treatment of the official." (Maj. opn., *ante,* at p. 739.) The majority would find actionable intrusion in such circumstances.

The above hypothetical leaves unanswered a number of questions. How close a friend does one have to be in order for there to be a reasonable expectation of privacy in the information that the friend possesses? Does the reasonable expectation apply to all relatives, even estranged ones or distant ones? Presumably it would not apply to the casual acquaintance, even if improper means were used. Or is it always for the jury to decide how close an acquaintance must be in order for there to be a reasonable expectation? Does the reasonable expectation apply to information the plaintiff has made no effort to keep secret? In cases implicating the First Amendment, we should " 'strive for as much predictability as possible within our system of case-by-case adjudication, lest we unwittingly chill First Amendment freedoms.' " (*Shulman, supra,* 18 Cal.4th at p. 221.) The majority's hypothetical, like the opinion in general, raises more questions than it answers.

Nonetheless, the majority may be correct that, at least under some circumstances, a person would be able to sue in the above hypothetical situation. It may be the case, for example, that a politician has a right to some degree of privacy as to the contents of her medicine cabinet, and has a reasonable expectation that her spouse will keep those contents confidential. A journalist posing as a medical doctor in a confidential relationship with the politician in order to trick the spouse into revealing such highly personal medical information may be liable for an intrusion. It is arguably true that the politician in the hypothetical has a reasonable expectation that the spouse would keep the information private but for the journalist's deception.

But the majority does *not* contend Taus had a reasonable expectation that Cantrell would keep what she had observed about Taus private but for Loftus's misrepresentation. Rather, in explaining the core rationale for its holding, the majority states that because Loftus allegedly engaged in misrepresentations to obtain information about Taus, "we cannot say, as a matter of law, that such questionable and unorthodox action constitutes conduct that plaintiff reasonably should have foreseen or anticipated. Instead, we believe a jury could find *that plaintiff reasonably expected* that an investigator would not seek and obtain access to such personal information about her from a relative or friend by falsely posing as an associate or supervisor of a mental health professional in whom plaintiff had confided." (Maj. opn., *ante*, at p. 736, original italics omitted, new italics added.)

This point is underscored by the majority's discussion of whether Taus's alleged separation and estrangement from Cantrell affected the former's reasonable expectation of privacy. The majority concludes that it does not: "[E]ven if a jury were to find that plaintiff's separation from Cantrell diminished plaintiff's reasonable expectation that Cantrell would not *voluntarily* disclose private information about her to others, it would not follow that a jury could not find that Loftus's conduct nonetheless violated plaintiff's reasonable expectation of privacy. As explained above, even *if plaintiff could not have had a reasonable expectation that Cantrell would not voluntarily disclose such information*, a jury could find that plaintiff reasonably could expect that an unrelated investigator—like Loftus—would not engage in the unorthodox and improperly intrusive conduct of persuading Cantrell to reveal personal information about her by intentionally misrepresenting herself . . . ." (Maj. opn., *ante*, at pp. 736–737, fn. 19, italics added.)

In so concluding, the majority confuses the first and second prongs of the intrusion tort. Again, a plaintiff must prove both intrusion into a place, conversation, or data source in which he or she has a reasonable expectation

of privacy *and* that the intrusion occurred by use of means highly offensive to a reasonable person. (*Shulman, supra,* 18 Cal.4th at p. 231.) The majority solves its reasonable expectation of seclusion problem by concluding that Taus would not reasonably expect that someone would use highly offensive means, such as posing as an associate of a trusted mental health professional, to acquire the information. But that is not enough—highly offensive means are unreasonable by definition, and a plaintiff presumably will never reasonably expect that such means would be employed. As discussed above, in addition to showing the use of highly offensive means to obtain the information, a plaintiff must also show a reasonable expectation that the information source would have kept the information private but for the employment of those means. No court has ever come close to adopting the majority's contrary position. Just as a person has no right to sue the operator of a hidden camera who films him in public (*Sanders, supra,* 20 Cal.4th at p. 914), so a person has no right to sue an investigator who obtains information in which the person had no reasonable expectation of privacy to begin with, even when the investigator employs offensive means to do so.

The majority analogizes the present situation to wiretapping or similar such intrusions. As it states: "Just as the plaintiff in *Sanders v. American Broadcasting Companies, supra,* 20 Cal.4th 907, retained a reasonable expectation of privacy that was violated when his conversations with coemployees in a nonpublic workplace were covertly videotaped by an undercover journalist, and just as a person retains a reasonable expectation of privacy that is violated when a third party defendant, by wiretapping a phone conversation or surreptitiously recording an in-person conversation, gains access to private information that the person has chosen to share with another person, a person similarly retains a reasonable expectation of privacy that may be violated when a third party defendant, by engaging in improper and unforeseen conduct, gains access to private information about the person from the person's relative or friend." (Maj. opn., *ante,* at p. 733.)

Yet although courts have held that wiretapping or surreptitious recording of conversations violates the rights of those wiretapped or recorded, because such intrusions violate well-defined expectations of privacy (see *Shulman, supra,* 18 Cal.4th at p. 233; *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 168, fn. 8 [84 Cal.Rptr. 718, 465 P.2d 854]), neither Taus nor the majority cites a case extending these holdings to allow those mentioned during such conversations a right to sue for invasion of privacy. Even assuming that a court would recognize such a right under limited circumstances, nothing in case law suggests that courts would allow a plaintiff who is not a party to the conversation to dispense with the showing that he or she had a reasonable

expectation that the information revealed about him or her would remain private.

Moreover, to the extent those mentioned in a wiretap or a surreptitiously recorded conversation may have a right of action for intrusion without any further showing, that right would be essentially derivative of, or a foreseeable consequence of, the clear invasion of the privacy of those wiretapped or recorded. But misrepresentation, while it may constitute fraud or some other tortious action, does not necessarily amount to an intrusion into the privacy of those who are the objects of the misrepresentation. Indeed, we recognized this very distinction between covert recording and misrepresentation in *Sanders*, in which we quoted with approval the court's language in *Dietemann v. Time, Inc.* (9th Cir. 1971) 449 F.2d 245 (*Dietemann*), wherein reporters for a news magazine deceitfully gained access to a quack doctor's home office and secretly photographed and recorded his examination of one of them: " 'One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large . . . .' " (*Sanders*, *supra*, 20 Cal.4th at p. 916, quoting *Dietemann*, *supra*, at p. 249.)

Thus, *Sanders* and *Dietemann* stand for the proposition that when person A has no expectation of privacy in a conversation or data source, the fact that person B gains access to such conversation or data source through false pretenses does not by itself make B liable for intrusion. Rather, what is decisive in those cases is the unremarkable conclusion that secretly filming people in a relatively secluded workplace or office, and thereby potentially exposing them to the public at large, is greater intrusion upon their privacy than covertly observing them, and that the former may be an actionable invasion of privacy even when the latter is not. Contrary to the majority's implication, (see maj. opn., *ante*, at pp. 741–742, fn. 23), we never remotely suggested in *Sanders* that if a person simply imparts information to someone she has invited into her home who is "not what he seems," and who does not secretly record the conversation, then a relative of the person could sue even if the relative had no reasonable expectation the information would be kept private.

The question then is, did Taus have a reasonable expectation that Cantrell would have kept the information revealed to Loftus about her private, but for Loftus's deception? In answering that question we must consider not simply

whether, in the abstract, a child would have a reasonable expectation that a parent would keep a certain type of information private (see maj. opn., *ante*, at pp. 741–742, fn. 23), but rather whether, under the particular circumstances of this case, Taus had a reasonable expectation that Cantrell's information would be kept private. I would conclude she did not, for several reasons. First, the information Loftus obtained was directly pertinent to the Jane Doe case study that had become central to the recovered memory controversy. Indeed, as noted, the same issue of Child Maltreatment in which Corwin's article appeared posed as a followup research question, whether the recovered memory incident had "produced a substantial change in [Taus's] life, for better or for worse." (Putnam, *Commentary* (May 1997) 2 Child Mistreatment 17, 120.) As the majority acknowledge: "Because plaintiff had agreed to permit Corwin to use her case study at educational seminars and in an article published in a scientific journal—albeit without identifying plaintiff by name—it may well be that plaintiff could not have had an objectively reasonable expectation that an investigator or academic researcher, like Loftus, would not discover her identity and pose probing questions to Cantrell relating to such personal matters." (Maj. opn., *ante*, at p. 735.)

Moreover, although Taus may have hoped Cantrell would not speak to people other than Corwin about her observations about Taus's behavior, she fails to demonstrate that she had an objectively reasonable expectation that Cantrell would refrain from doing so. Cantrell had no legal obligation to so refrain. Nor is there any well-established custom or habit that would dictate that a foster mother should not talk about a former foster child's behavior to others, for example, friends, relatives, and neighbors. Moreover, at issue is not private conversations between Taus and Cantrell in which some expectation of confidentiality may be inferred, but Taus's behavior. Nor, given the fact that Taus's case was at the center of an academic controversy, did Taus have a reasonable expectation that Cantrell would refuse to talk to a bona fide academic researcher making reasonable inquiries about the effect of the recovered memory. Nor does the fact that Taus broke off the foster parent-child relationship weigh in favor of an expectation that Cantrell would keep Taus's behavior private.

Furthermore, we do not know from the complaint or from plaintiff's declarations in opposition to the anti-SLAPP motion whether and to what extent Cantrell had already disclosed this information to others. And because the information in question, Taus's behavior, was not confined to the seclusion of Cantrell's home, we have no way of knowing whether it was already generally known in the community. Also, Cantrell's revelations to Loftus do not go much further than what Cantrell had already revealed in the Child Maltreatment article, when she told Corwin that Taus was a rebellious and

troubled teenager who was "tragically headstrong" and who "didn't have rules or regulations and wouldn't succumb to any," and who spoke of suicide and giving up. How could Taus have a legally enforceable expectation that Cantrell would keep private information if it was already generally known? And even if Cantrell kept quiet, how could Taus have had a reasonable expectation that the information would not be revealed by another source?

Perhaps it can be argued that spreading some local gossip is different from talking to an academic researcher who would disseminate the information to a wider academic audience, and that Taus expected that Cantrell would make that distinction and act accordingly. But there are at least two problems with that argument. First, as discussed, there is nothing in law or custom that would dictate that Cantrell would refuse to talk to a legitimate academic investigator about Taus, given the fact that Taus's personal life was at the center of an academic controversy. Second, Loftus was in fact very discreet about the information she obtained. She did not reveal Taus's identity, and did not disclose the fact that Cantrell said she had engaged in promiscuous behavior and drug use until after the litigation had commenced. Loftus mentioned at an academic conference only that "Jane Doe" had engaged in unspecified "destructive behavior" after the supposed recovered memory incident. Unlike the fake employee with the hidden camera in *Sanders*, Loftus was not masking a hidden purpose of filming and ultimately publicizing private information. Although she is alleged to have misrepresented her association with Corwin, she did not misrepresent her status as an academic researcher bound by protocols of confidentiality.

It may be that Taus would have preferred that Cantrell not reveal the further intimate details of her life to Loftus because, unlike Corwin, and unlike the friends or neighbors that Cantrell might have spoken to, Taus perceived Loftus as threatening because she was contesting claims that Taus had been sexually abused. In fact, it is fairly apparent that the impetus for this litigation is not Loftus's investigative techniques but her perceived adversarial stance toward Corwin and, derivatively, toward Taus. But by any ordinary sense, the desire to deny an investigator information based on the investigator's viewpoint cannot be called an expectation of privacy or seclusion, and the enforcement of Taus's preference through tort law is contrary to free academic inquiry and the First Amendment.

Of course, Cantrell herself had an interest in not being deceived. If she revealed information she would not have otherwise disclosed but for the misrepresentation, and if such disclosure caused some tangible injury, she might have an action for intentional infliction of emotional distress, fraud, or some other tort. But Cantrell is not the plaintiff here, and this issue is beyond the scope of the case. Nor do we consider whether Loftus would be liable if

she had lied to Taus to get the latter to reveal information. The question is whether Taus had a reasonable expectation that Cantrell would keep private certain personal information about her. The answer based on the present record is that she did not. Her tort for intrusion into private matters therefore should fail, even if Loftus engaged in the misrepresentations alleged by Cantrell to obtain that information.

## IV.

The majority's desire to protect society from the kind of misrepresentations alleged in the present case is understandable, and it may be argued that a person could avoid intrusion suits of this kind by simply telling the truth. But of course Loftus vigorously denies having made any misrepresentations. The real question is whether we should subject academics and other investigators to right to privacy suits based on allegations that the means of obtaining information from a third party was unscrupulous, when the information obtained is itself not something an individual can reasonably expect to be kept private.

To insist that the reasonable expectation of privacy requirement be rigorously adhered to is not simply a matter of formal doctrinal correctness, but serves to enforce an important constitutional and policy principle. Permitting suits that do not meet this requirement will likely chill vigorous journalistic investigation because of the inherently problematic nature of the relationship between journalists and their news sources. As an amicus curiae brief filed on behalf of the various news organizations states: "The media . . . will be left vulnerable to intrusion claims arising from a news source's belated attempt to distance himself from the information he disclosed by asserting that the media engaged in some sort of misrepresentation to obtain it. Sources who voluntarily provide information to the media often take issue after the fact with some aspect of what the media ultimately reported. Indeed, when the subject of an unflattering or critical news report complains to a source of information for that report who allegedly revealed private or injurious information to a reporter, it creates a motive for the source to belatedly contend that the reporter obtained the information by misrepresentation," or other improper means. The same dynamic may occur in academic investigations. While the media organizations may not be correct that journalists should enjoy a blanket immunity from all such suits based on alleged misrepresentations to third party news sources, at the very least, no suit should be allowed when the plaintiff has not demonstrated a reasonable expectation that the information in question would be kept private but for the misrepresentations.

Given the important interests at stake, and the fact that the significant expansion of the intrusion tort found in the majority opinion can correspondingly diminish academic and journalistic freedom, we should undertake such expansion only with the greatest of care. Here, Taus has demonstrated no reasonable expectation that the information revealed to Cantrell would be kept private but for the misrepresentation. Taus's cause of action for intrusion should therefore be stricken pursuant to Code of Civil Procedure section 425.16, which was specifically intended to weed out such unmeritorious suits impinging on free speech and inquiry.

I therefore respectfully dissent.

Baxter, J., concurred.